14 F.3d 604
NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
 Ronnie BULLOCK, Plaintiff/Appellant,
v.
Kenneth L. McGINNIS, et al, Defendants/Appellees.
 No. 92-2860.
 United States Court of Appeals, Seventh Circuit.
 Submitted Dec. 16, 1993.*
Decided Dec. 21, 1993.
 
 Before Fairchild, Bauer and Manion, Circuit Judges.
 
 ORDER
 
 1
 Ronnie Bullock brought this pro se civil rights action against several Illinois state prison officials pursuant to 42 U.S.C. Sec. 1983, alleging, among other claims, that the defendants (1) violated his due process rights during two disciplinary hearings, (2) abridged his freedom of religion by denying him access to religious services while in protective custody, and (3) violated his First Amendment rights by confiscating his mail that contained a photograph of a semi-nude female. The district court granted various summary judgments in favor of the defendants on all three counts. Bullock appeals. We affirm.
 
 
 2
 We review the grant of summary judgment de novo. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). We view the record and the inference drawn from it in the light most favorable to Bullock, the non-moving party, United States v. Diebold, Inc., 369 U.S. 654, 655 (1962), and will affirm if there is no genuine issues of material fact such that judgment is proper as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).
 
 I. The Disciplinary Hearings
 
 3
 At the February 9, 1990 hearing, the adjustment committee refused to grant Bullock a continuance to secure witnesses. See Wolff v. McDonnell, 418 U.S. 539, 562 (1974) (due process requires that inmates be permitted, when consistent with institutional safety and correctional goals, to call witnesses and present documentary evidence in their defense). Bullock received a disciplinary report on February 7, notifying him of the hearing. The report contained a detachable witness request form, which was not filled out and returned by Bullock. At the hearing, Bullock orally requested one particular witness to be interviewed. The witness was contacted, but he contradicted Bullock's statement. Bullock then requested a continuance, stating that he had insufficient time to contact witnesses and prepare his defense. The committee denied the request because Bullock did not show good cause; he failed to address the questions of why he had not made the request for witnesses before the hearing, who the witnesses might be, and what each witness would say.
 
 
 4
 In Davis v. Lane, 814 F.2d 397, 402 (7th Cir.1987), we said that whether a denial of an inmate's request for continuance by the adjustment committee violated due process is a jury question where the request was denied solely because the inmate was unable to name the witnesses he planned to call. We reasoned that the inmate may have needed the continuance not only to gather witnesses but also to determine who such witnesses might be. Davis is distinguishable because there the inmate was either in a hospital outside of the prison or in the prison infirmary during the period preceding the hearing, and the hearing was conducted while he was still recuperating in the infirmary and despite his request for a continuance to locate witnesses.
 
 
 5
 In the present case, Bullock was given an opportunity to call witnesses prior to the hearing but failed to do so.[1] His own inaction coupled with his failure to adequately explain why he was entitled to a continuance to secure witnesses could lead the adjustment committee to determine that there was no good cause. He cannot now claim that he was denied due process. Cf. Hamilton v. O'Leary, 976 F.2d 341, 346 (7th Cir.1992) (adjustment committee's failure to call prisoner's witnesses in disciplinary hearing did not violate due process where the prisoner failed to fill out the witness request portion of the disciplinary report prior to the hearing).
 
 
 6
 With respect to the February 28 hearing, Bullock challenges the sufficiency of the evidence for the disciplinary committee to find him guilty of possessing dangerous contraband.[2] Our review of the adjustment committee's finding of guilt is limited to determining whether "there is any evidence in the record that could support [its] conclusion." Superintendent v. Hill, 472 U.S. 445, 455-56 (1985). This does not require "examination of the entire record, independent assessment of the credibility of witnesses, or weighing of evidence." Id. at 455. Due process is satisfied as long as "some evidence" supports the prison disciplinary board's decision." Id. Although the evidence must "point to the accused's guilt," Lenea v. Lane, 882 F.2d 1171, 1175 (7th Cir.1989), only evidence that was presented to the adjustment committee is relevant to our analysis. Hamilton v. O'Leary, 976 F.2d 341, 346 (7th Cir.1992).
 
 
 7
 According to the disciplinary report, a ten-inch homemade shank was found in the outside panel over Bullock's cell. At the hearing, Bullock admitted that the shank was found in the top panel of his cell and that he was the sole occupant of the cell. Bullock argues at the district court and on appeal that sixty-four inmates had access to the panel and that any one of them could have placed the shank there. There is no showing in the record that Bullock made this argument to the committee or that the committee was aware of other inmates' access. Neither does the adjustment committee's summary report read in conjunction with the disciplinary report address the question of access. Accordingly, we find Bullock's argument concerning access waived. See Hamilton, 976 F.2d at 347-48 (rejecting inmate's allegation that thirty-two other inmates had access to the vent in which weapons were found where inmate failed to allege in his complaint that this fact was known to the disciplinary committee). While the adjustment committee's evidence is circumstantial, we cannot say that it was not supported by "some evidence." See Id. at 346 (holding "some evidence" requirement satisifed where inmate was found guilty of possessing six homemade weapons discovered in a vent in the cell that inmate shared with three other cellmates).
 
 
 8
 Bullock also claims that he was unable to present documentary evidence at both hearings. This issue was not raised at the district court. Generally, we will not consider an argument presented for the first time on appeal. Williams v. Turner, No. 91-1283, slip op. at 4-5 (7th Cir. Sept. 28, 1993). See also Singleton v. Wulff, 428 U.S. 106, 120-121 (1976). However, because the defendants do not assert waiver but ignored the claim entirely, they have waived the waiver defense. Colburn v. Trustees of Indiana Univ., 973 F.2d 581, 588 (7th Cir.1992). We find Bullock's claim frivolous. With respect to the February 9 hearing, the documentary evidence alleged to have been precluded by the adjustment committee seems to be the affidavits of two witnesses. Since both documents were dated after the hearing, Bullock could not have attempted to present them at the hearing. Similarly, no evidence supports Bullock's contention that he was prevented from presenting evidence at the February 28 hearing. The only written "exculpatory evidence" relating to this hearing was his own statement which was considered by the committee and found to be unbelievable.
 
 II. Freedom of Religion
 
 9
 Bullock next contends that the defendants violated his First Amendment free exercise rights by denying him access to the Jumu'ah congregation services mandated by the Koran. While a prisoner does not forfeit his constitutional right to exercise his religion, such right must give way to regulations that are "reasonably related to legitimate penological objectives." O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987) (citing Turner v. Safley, 482 U.S. 78, 89 (1987)); Richards v. White, 957 F.2d 471, 474 (7th Cir.1992). Though the availability of a ready alternative is relevant to the reasonableness inquiry, prison officials need not demonstrate that there is no reasonable alternative to accommodate the prisoner's free exercise rights without creating security problems. O'Lone, 482 U.S. at 349; Williams v. Lane, 851 F.2d 867, 877 (7th Cir.1988), cert. denied, 488 U.S. 1047 (1989). Furthermore, "when accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates," we will be "particularly deferential to the informed discretion of corrections officials." Turner, 482 U.S. at 90.
 
 
 10
 In balancing Bullock's free exercise rights against the prison's penological interests, Richards, 957 F.2d at 474, we find that the defendants' denial of Bullock's access to the Jumu'ah services is supported by legitimate security concerns. Bullock was a Category 3 or 4 inmate at all relevant times at Statesville, a maximum security facility. That is, he was temporarily placed in protective custody either while his gang affiliations were being verified, or while the denial of his protective custody status was being reconsidered.
 
 
 11
 The defendants explain that when Category 3 or 4 inmates are allowed contact with other protective custody inmates, classified as Category 1 and 2, the opportunity for assault "increases tremendously." Thus, Category 3 and 4 inmates are kept separate from Category 1 and 2 inmates to protect inmates with legitimate security concerns from those who may have no legitimate basis for protective custody. Accordingly, while Category 1 and 2 inmates are allowed to attend Jumu'ah, Category 3 and 4 inmates are denied such access.
 
 
 12
 Considering "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally," Turner, 482 U.S. at 90, we cannot say that the policy of precluding Category 3 and 4 inmates from attending Jumu'ah is unreasonable.[3] See O'Lone, 482 U.S. 342 (upholding prison policy of precluding Muslim prisoners, assigned to outside work, from returning to the prison building to attend Jumu'ah because the returns generated congestion and delays at the prison gate, a high security risk area, and because prisoners' return requests placed unacceptable administrative burden on guards supervising outside work details). Furthermore, Bullock is allowed to visit his chaplain at the chapel and there is no other evidence of restrictions on Bullock's exercise of his religion. See Siddiqi v. Leak, 880 F.2d 904, 910 (1989) (no denial of inmate's free exercise rights where evidence does not reflect any restriction on inmate's ability to practice his religion, save for the inability to attend Jumu'ah). While there is no alternative means of attending Jumu'ah as Bullock's religious belief mandates the attendance, the prison officials are not required to sacrifice legitimate penological objectives to that end. O'Lone, 482 U.S. at 351. Accordingly, the district court properly granted the summary judgment in favor of the defendants on this count.
 
 III. Mail Confiscation Claim
 
 13
 Bullock alleges that the defendant unconstitutionally confiscated his mail that contained a photograph of an adult female partially exposing her genitalia to two clothed young children and two letters that referred to the photograph.[4] In evaluating prison officials' censorship of an inmate's incoming correspondence, we use the reasonableness standard set forth in Turner v. Safley, 482 U.s. 78, 89. See Thornburgh v. Abbott, 490 U.S. 401, 413 (1989) (limiting the less deferential standard of Procunier v. Martinez, 416 U.S. 396 (1974), to regulations concerning inmates' outgoing correspondence because their implications for prison security are of a categorically lesser magnitude than that of incoming materials). The defendants' confiscation of Bullock's mail is reasonable only if it is "reasonably related to legitimate penological interests." Thornburgh, 490 U.S. at 404. The regulation at issue will pass constitutional muster if it serves the neutral and legitimate objective of jail security. Id. at 414.
 
 
 14
 The defendants argue that they confiscated Bullock's mail partly for security reasons; they seized the envelope containing the "lewd" photo of Bullock's female correspondent because they were aware of his convictions of deviate sexual assault and aggravated kidnapping. They contend that the mail, if released, is likely to result in physical harm to another, and therefore they properly confiscated the non-privileged mail under appropriate prison regulations. Ill.Admin.Code tit. 20, Secs. 525.140(g), 525.130(h) (1991).
 
 
 15
 In Trapnell v. Riggsby, 622 F.2d 290 (7th Cir.1980), a case decided under the Martinez standard, we upheld the constitutionality of federal prison regulations that prohibit receipt of non-commercially published photographs of nude or seminude women. We did so in light of the assaultive background of that particular prison's inmates and upon a showing that the propensity of violence is increased by the possession of such "highly emotionally charged" photos. To the extent that the prison officials' expert judgment leads them to conclude that the release of Bullock's mail may impede institutional security, such judgment is afforded considerable deference. Thornburgh, 490 U.S. at 407-408; Bell v. Wolfish, 441 U.S. 520, 547 (1978). We cannot say that the seizure in this case is not supported by legitimate penological interests. See Thornburgh, 490 U.S. at 417 (stating that it is rational for the Bureau of Prisons to exclude in-coming materials that "although not necessarily 'likely' to lead to violence, are determined by the warden to create an intolerable risk of disorder under the conditions of a particular prison at a particular time.")
 
 
 16
 Moreover, as the district court found, the regulation is neutral in application. The prison mail office uses a standard form that contains a nonexhaustive list of criteria for returning an inmate's mail. One of the criteria is: "nude pictures are not permitted-the body must be covered." (Defendant's Exhibit 12). Thus, it seems that the exclusion of photographs containing nudity does not depend on an individual prison official's arbitrary judgment but is categorically applied. See Thornburgh, 401 U.S. at 415 (stating that the ban on all correspondence between certain classes of inmates at issue in Turner clearly meets the "neutrality" criterion); Trapnell, F.2d 290 at 293 (censorship regulations upheld because they do not entitle the prison officials "to apply their own personal prejudices and opinions as standards for prisoner mail censorship." )
 
 
 17
 For the foregoing reasons, the district court's judgments are AFFIRMED.
 
 
 
 *
 After preliminary examination of the briefs, the court notified the parties that it had tentatively concluded that oral argument would not be helpful to the court in this case. The notice provided that any party might file a "Statement as to Need of Oral Argument." See Fed.R.App.P. 34(a); Cir.R. 34(f). No such statement having been filed, the appeal is submitted on the briefs and record
 
 
 [1]
 In Miller v. Duckworth, 963 F.2d 1002 (7th Cir.1992), we rejected the argument that failure to fill out the witness request form amounts to wavier of the right to request witnesses at a later date. We said that an inmate should not be required to come up with the names of all his potential defense witnesses immediately upon notification. However, while due process dictates that an inmate be given a reasonable time to plan his defense, "the prisoner certainly cannot wait until the day of the hearing to make such requests." Id. at 1005 n. 2
 
 
 [2]
 Although this issue was raised at the district court, it was not raised in Bullock's brief in chief. However, because the defendants addressed the issue in their appellate brief, and Bullock responded in his reply brief, we will address the issue
 
 
 [3]
 Bullock cites Williams v. Lane, 851 F.2d 867 (7th Cir.1988), in which we held that Statesville's prison authorities violated protective custody inmates' First Amendment rights by not providing them the same opportunity for free exercise of religion as the general population inmates. Williams is distinguishable because there the protective custody inmates were denied all opportunities to exercise their religion except for counseling by prison chaplains through the cell bar door. More importantly, the defendants failed to show that "security considerations would be seriously implicated by an equal treatment." Id. at 872. Moreover, the "protective custody inmates" in Williams were Category 1 and 2 inmates whose security concerns were substantiated and identified and whose placement in protective custody were "truly neither 'voluntary' nor 'temporary,' " id. at 874, unlike the more transient Category 3 and 4 inmates. In fact, the district court's decree affirmed by this court in Williams mandating the increase of opportunity for free exercise of religion specifically states that the decree is inapplicable to inmates in screening or classification (referred to as Category 3 or 4 inmates). (Defendant's Exhibit No. 10)
 
 
 [4]
 The envelope also included a check, which was deposited into Bullock's prison account, and another letter. The contents of the envelope, with the exception of the check, were forwarded to the Department of Corrections' Internal Affairs. Believing that these items may be evidence of child abuse, the Deparment forwarded them to the Illinois Department of Children and Family Services