Julio GIANO, Plaintiff–Appellant,

v.

Daniel SENKOWSKI, Superintendent, Clinton Correctional Facility; Thomas Coughlin, Commissioner, Department of Correctional Services, Defendants–Appellees.

No. 359, Docket 94–2167.

United States Court of Appeals, Second Circuit.

Submitted Nov. 24, 1994.

Decided May 16, 1995.

Julio Giano, pro se.

Peter H. Schiff, Deputy Sol. Gen., Albany, NY (G. Oliver Koppell, Atty. Gen., Albany, NY, of counsel), for defendants-appellees.

Before: McLAUGHLIN, JACOBS, and CALABRESI, Circuit Judges.

McLAUGHLIN, Circuit Judge:

In July 1991, inmate Julio Giano's girlfriend sent him an envelope containing two semi-nude photographs of herself. Pursuant to prison policy, a prison mailroom employee confiscated the photographs.

Giano filed an action under 42 U.S.C. § 1983 in the United States District Court for the Northern District of New York (Neal P. McCurn, *Judge*), against two high ranking prison officials. He argued that the prison's policy banning sexually explicit photographs of inmates' wives and girlfriends violated his right to free speech under the First Amendment and his right to equal protection under the Fourteenth Amendment. He sought injunctive and declaratory relief as well as money damages. After both sides moved for summary judgment, the action was assigned to a magistrate judge, who recommended granting defendants' motion for summary judgment. The district court adopted the recommendation without opinion. Giano appeals.

Because the prison's policy is rationally related to the legitimate penological concern of minimizing violence in the prison setting, and because the policy only minimally burdens Giano's First Amendment freedoms, we affirm.

BACKGROUND

In July 1991, Clinton Correctional Facility ("Clinton") had a policy that allowed inmates to possess commercially produced erotic lit-

erature, e.g., Playboy Magazine, but prohibited possession of nude or semi-nude photographs of spouses or girlfriends. The State of New York Department of Correctional Services' Central Office Review Committee ("CORC") explained that the policy was designed to maintain prison security and decrease violence among inmates, stating:

> The possession of actual photographs of nude females, which may be either girlfriends or wives, could cause violent confrontations should they wind up in the possession of the wrong inmate/or be circulated amongst the members of the population. Photographs of nudes present a clear threat to safety, security and good order of the correctional facility. Consequently, due to the sensitive nature of nude photographs, they will not be permitted into the facility.

Pl. Mot. for Summ. J., Ex. B., Grievance No. WK 2089–88.

During July 1991, inmate Julio Giano's girlfriend (they later married) sent him an envelope containing four photographs, two of which were semi-nude pictures of her. In accordance with prison policy, a Clinton mailroom employee removed the two semi-nude photographs from the envelope addressed to Giano, and placed them with Giano's confiscated personal property. He then forwarded the rest of the envelope to Giano along with an explanatory note.

In April 1992, Giano filed a complaint under 42 U.S.C. § 1983 against defendants Daniel Senkowski, Superintendent of Clinton, and Thomas Coughlin, Commissioner of the Department of Correctional Services. He alleged that the prison policy: (1) violated his right to freedom of speech under the First Amendment; (2) violated his right to equal protection under the Fourteenth Amendment; and (3) was unconstitutionally vague. He sought injunctive and declaratory relief as well as money damages.

Both sides moved for summary judgment, and the case was assigned to a magistrate judge, who recommended granting defendants' motion for summary judgment. Analyzing Clinton's policy under the four-prong test set forth in *Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), the magistrate judge concluded that the policy passed constitutional muster because it was rationally related to legitimate penological interests. He further rejected Giano's equal protection challenge, explaining that Giano offered no evidence that the policy intentionally discriminated against an identifiable class of prisoners, and finding that the policy applied evenhandedly to all inmates.

On March 19, 1994, the district court adopted the magistrate judge's report-recommendation, and granted defendants' motion for summary judgment without opinion. Giano now appeals.

## DISCUSSION

■■■ To prevail on a motion for summary judgment, the moving party must show that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); Fed.R.Civ.P. 56(c). In deciding such a motion, the district court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. *Consarc Corp. v. Marine Midland Bank, N.A.,* 996 F.2d 568, 572 (2d Cir.1993). We review the district court's grant of summary judgment *de novo. Westinghouse Elec. Corp. v. New York City Transit Auth.,* 14 F.3d 818, 821 (2d Cir.1994).

### I. *Giano's First Amendment Claim*

■■■ Giano argues that the prison's policy violates the First Amendment. We disagree.

■■■ Prison walls are not a barrier separating inmates from the protections of the constitution. *Thornburgh v. Abbott,* 490 U.S. 401, 407, 109 S.Ct. 1874, 1878, 104 L.Ed.2d 459 (1989); *Turner v. Safley,* 482 U.S. 78, 84, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987). The Supreme Court has also acknowledged, however, that "[t]he fact of confinement and the needs of the penal institution impose limitations on constitutional rights, including those derived from the First Amendment, which are implicit in incarceration." *Jones v. North Carolina Prisoners' Union,* 433 U.S.

119, 125, 97 S.Ct. 2532, 2537–38, 53 L.Ed.2d 629 (1977); *see Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974); *Wolff v. McDonnell,* 418 U.S. 539, 555, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1974).

 A prison inmate, therefore, retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system. *North Carolina Prisoners' Union,* 433 U.S. at 125, 97 S.Ct. at 2537 (quoting *Pell,* 417 U.S. at 822, 94 S.Ct. at 2804). The Court has counseled judicial restraint in the federal courts' review of prison policy and administration, noting that "courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform." *Turner,* 482 U.S. at 84, 107 S.Ct. at 2259 (quoting *Procunier v. Martinez,* 416 U.S. 396, 405, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974)). Moreover, the doctrines of separation of powers and federalism (where, as here, a state penal system is involved) dictate a policy of judicial restraint. *See id.* at 85, 107 S.Ct. at 2259.

*Turner* is particularly instructive. There, inmates alleged that a prison policy prohibiting correspondence among inmates of different institutions violated the First Amendment. Balancing the competing concerns, the *Turner* court held that the appropriate standard of review was a "reasonableness" review. *Turner,* 482 U.S. at 89, 107 S.Ct. at 2261–62 ("[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."). The *Turner* court explained that such a deferential standard was necessary if "prison administrators ..., and not the courts, [are] to make the difficult judgments concerning institutional operations." *Id.* (quoting *North Carolina Prisoners' Union,* 433 U.S. at 128, 97 S.Ct. at 2539) (internal quotations omitted).

The *Turner* court set forth a four-part test to determine the reasonableness of the regulation at issue:

> First, there must be a "valid, rational connection" between the prison regulation and the legitimate governmental interest put forward to justify it.... Moreover, the governmental objective must be a legitimate and neutral one....
>
> A second factor ... is whether there are alternative means of exercising the right that remain open to prison inmates....
>
> A third consideration is the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally....
>
> Finally, the absence of ready alternatives is evidence of the reasonableness of a prison regulation..

*Id.* at 89–90, 107 S.Ct. at 2261–62 (citations omitted).

The *Turner* test has been routinely invoked to uphold prison policies restricting First Amendment rights that would not be permissible outside the prison context. *See Thornburgh,* 490 U.S. at 403, 109 S.Ct. at 1876 (upholding a regulation prohibiting inmates from receiving incoming publications which were detrimental to prison security); *O'Lone v. Shabazz,* 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) (upholding a regulation prohibiting Muslim inmates from attending weekly afternoon services), *superseded by* Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. § 2000bb (Nov. 16, 1993); *Turner,* 482 U.S. at 78, 107 S.Ct. at 2255–56 (upholding a regulation severely restricting correspondence between prisoners at different penal institutions); *Fromer v. Scully,* 874 F.2d 69 (2d Cir.1989) (upholding a policy restricting inmates' beard length), *superseded by* RFRA.

Indeed, the very policy Giano complains about has been upheld in other circuits involving other prisons.[1] *See Trapnell v.*

---

1. The dissent notes that the appellate rules of the Seventh and Ninth Circuits prohibit citations to unpublished panel opinions. *Compare* 7th Cir.R. 53 (prohibiting citation to unreported panel opinions); 9th Cir.R. 36–3 (same); 1st Cir. R. 36.2 (same) *with* 6th Cir.R. 24 (merely disfavoring citation to unpublished panel opinions). Paradoxically, the dissent then quotes from those unpublished decisions. The majority, in contrast, cites to the district court decisions in *Davis, Bullock,* and *Furrow,* merely noting the affirmances as relevant subsequent history, pursuant

*Riggsby,* 622 F.2d 290, 292 (7th Cir.1980) (upholding prison policy banning nude photos of wives or girlfriends, but employing a stricter standard of review—reasonable regulations necessary to further significant government interests—than *Turner* ); *Davis v. Yohey,* No. 90–172 (HDM) (D.Nev. July 8, 1991) (applying *Turner* to uphold a policy banning nude photographs of an inmate's spouse or girlfriend), *aff'd,* 981 F.2d 1257 (9th Cir.1992) (unpublished order); *Bullock v. McGinnis,* No. 90–7019, 1992 WL 166666 (N.D.Ill. July 9, 1992) (same citing *Trapnell* ), *aff'd,* 14 F.3d 604 (7th Cir.1993) (unpublished order); *Furrow v. Magnusson,* No. 90–0212 (DBH) (D.Me. May 31, 1991) (dismissing prisoner's constitutional claims regarding prison officials' confiscation of a photo album containing nude photographs), *aff'd,* 960 F.2d 143 (1st Cir.1992) (unpublished order); *Thomas v. Scully,* Civ. No. 89–4175, 1990 WL 200641, 1990 U.S. Dist. LEXIS 16229 (S.D.N.Y. Dec. 5, 1990) (applying *Turner* to uphold a policy banning nude photographs of an inmate's spouse or girlfriend); *see also Patterson v. Koehler,* No. 83–1278, 718 F.2d 1100, 1983 U.S.App. LEXIS (6th Cir. Aug. 29, 1983) (unpublished opinion) (applying *Trapnell* to uphold prison policy), *cert. denied,* 464 U.S. 1046, 104 S.Ct. 719, 79 L.Ed.2d 181 (1984). *But cf. Pepperling v. Crist,* 678 F.2d 787 (9th Cir.1982) (although concluding that nude photographs of wives and girlfriends were emotionally charged and often lead to violent altercations among inmates, the court rejected the prison policy as too broad, holding that the prison must employ the less restrictive alternative—subsequently rejected in *Turner*—of prohibiting prisoners from openly displaying the photos in their cells).

 The prisoner-plaintiff bears the burden of proving that the disputed regulation is unreasonable. *See Fromer,* 874 F.2d at 74 ("[T]here was no burden on DOCS [Department of Correctional Services] to persuade the district court that its concerns [justifying a prison policy restricting beard length] were justifiable. Rather, the burden was on the plaintiff to show that these concerns were

irrational."). *Cf. O'Lone,* 482 U.S. at 350, 107 S.Ct. at 2405 ("By placing the burden on prison officials to disprove the availability of alternatives, the approach articulated by the Court of Appeals fails to reflect the respect and deference that the United States Constitution allows for the judgment of prison administrators."); *Turner,* 482 U.S. at 90–91, 107 S.Ct. at 2262 ("[P]rison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint."). Thus, although we must draw all reasonable inferences in Giano's favor for purposes of summary judgment, Giano must still meet his burden of proving the policy irrational to avoid dismissal.

1. Turning to the first *Turner* factor, the prison officials' purpose in promulgating the regulation—maintaining prison security and protecting against increased inmate violence—is obviously legitimate. *See e.g., Thornburgh,* 490 U.S. at 415, 109 S.Ct. at 1882 (the legitimacy of prison regulations whose purpose is to protect prison security is beyond question because that purpose is "central to all other corrections goals") (quoting *Pell,* 417 U.S. at 823, 94 S.Ct. at 2804).

Giano, however, disputes that there is a valid, rational connection between the legitimate interest of maintaining prison security and Clinton's policy. He contends that the policy is irrational and arbitrary, and that the government did not produce "an iota of evidence" to support it.

In response, the government advances two reasons why inmate possession of nude or semi-nude pictures of inmates' wives or girlfriends may precipitate violence within the prison population: (1) an inmate who knows a fellow inmate or guard has seen the photographs without permission may become violent; and (2) insults—intended or perceived—from inmates who see the photographs (even with permission) may lead to violence. The government contends that the threat of violence establishes a logical connection between the policy and the legitimate

---

to Blue Book R. 10.7.1(a) (15th ed. 1991). We realize, of course, that the decisions of the two appellate court panels and four federal district courts we cite do not bind this Court. We are,

however, not as quick as the dissent to disregard the judgments of other federal courts that have passed on prison regulations barring nude photos of spouses and loved ones.

government interest of maintaining prison security. We find the government's explanation of the connection between the prison regulation and the legitimate interest both valid and rational.

Our dissenting brother dismisses the government's explanation as "little more than a knee-jerk reaction," although he concedes that some regulations are so obviously well grounded that they may be sustained upon a "common sense determination." *Post* at 1059. Thus, we are of one mind on the principle, but disagree as to its application. We believe that common sense supports summary judgment here, as did every other federal court, save one, to pass on this question. We decline to dismiss those cases dealing with the same issue by regarding each as "a restricted railroad ticket, good for this day and train only." *Smith v. Allwright,* 321 U.S. 649, 669, 64 S.Ct. 757, 768, 88 L.Ed. 987 (1944) (Roberts, J., dissenting).

█ Prison officials must be given latitude to anticipate the probable consequences of certain speech, *see Martinez,* 416 U.S. at 414, 94 S.Ct. at 1811–12, and must be allowed to take reasonable steps to forestall violence. *North Carolina Prisoners' Union,* 433 U.S. at 132–33, 97 S.Ct. at 2541–42. Specifically, courts that have addressed banning nude photographs of inmate's wives or girlfriends have not required the extensive empirical support Giano demands before making the common sense determination that these photographs may provoke violence. In *Pepperling v. Crist,* 678 F.2d 787 (9th Cir.1982), for example, the court accepted as a "point [ ] well-taken" the proposition, unsupported by the reported facts in the record, that nude photos of wives or girlfriends were "highly emotionally charged and often lead to violent altercations among prisoners." *Id.* at 790. Similarly, the court in *Trapnell v. Riggsby,* 622 F.2d 290 (7th Cir.1980), upheld the regulation upon the simple showing that the prison housed long-term offenders with assaultive patterns of behavior, and the magistrate judge's unsupported (except by common sense) assertion that "the 'highly emotionally charged' nature of the photographs" increased the prisoners' propensity for violence. *Id.* at 293.

Because there is ample case law holding that the connection between the legitimate government interest and the prison's policy is valid and rational without the need for extensive factual "proof" of the link, and because we accord substantial deference to the informed judgment of prison officials on matters of prison administration, we find that there is a valid, rational connection between Clinton's policy and maintaining prison order and security.

As to neutrality: even content-based First Amendment restrictions have been treated as neutral if their sole purpose is to maintain prison security and decrease violence among inmates. *See Thornburgh,* 490 U.S. at 415–16, 109 S.Ct. at 1882–83 ("Where, as here, prison administrators draw distinctions between publications solely on the basis of their potential implications for prison security, the regulations are 'neutral'...."). Here, the prison policy is obviously content-based because its application depends on the sexually explicit nature of the photographs. The regulation nevertheless passes constitutional muster because its purpose is to maintain prison security and decrease violence among inmates. The regulation operates in a neutral fashion because it furthers "an important or substantial governmental interest unrelated to the suppression of expression." *Thornburgh,* 490 U.S. at 415, 109 S.Ct. at 1882 (quoting *Martinez,* 416 U.S. at 413, 94 S.Ct. at 1811).

2. Regarding *Turner's* second criterion, alternative means of exercising Giano's alleged First Amendment right remain open to inmates. We view the right "sensibly and expansively," *Thornburgh,* 490 U.S. at 417, 109 S.Ct. at 1884, and allow for flexibility in determining what qualifies as another means of expression. *See Turner,* 482 U.S. at 78, 107 S.Ct. at 2255–56 (regulation which prohibits communication between inmates at different prisons does not deprive inmates of all means of communication); *see also Thomas v. Scully,* Civ. No. 89–4715, 1990 U.S. Dist. LEXIS 17084, at *11 (S.D.N.Y. June 28, 1990) (Magistrate's Report) ("[S]o long as the regulations foreclose only one of several ways in which inmates may exercise a specific first amendment right, the fact the prohib-

ited activity may be a more desirable means of expression does not diminish the import of the remaining alternative.").

If Giano's right is framed as the right to graphic sexual imagery to satisfy carnal desires and expressions, commercially produced erotica and sexually graphic written notes from wives or girlfriends are adequate substitutes for semi-nude personal photographs. If, on the other hand, the right is seen as reinforcing the emotional bond between loved ones and similar affective links, conventional photographs and romantic letters would adequately satisfy this need. Historical evidence is abundant. For example, couples separated by the Civil War relied on studio portraits, *cartes de visite* and locket miniatures to keep green the memory of their beloved.

■ We intend no moral aspersions on Giano's preferred means of expressing his emotional bond with his paramour, recognizing, as we do, that one man's pornography may be another's keepsake. We do, however, hold that where "other avenues" remain available for the exercise of the asserted right, courts should defer to the informed discretion of prison officials to gauge the validity of the regulation. *See Turner,* 482 U.S. at 90, 107 S.Ct. at 2262.

3. As to *Turner's* third prong, if Giano's claim is accorded full constitutional protection, it will, perforce, have an adverse impact on guards, other inmates and prison resources. As discussed above, courts are not oblivious to the relationship between allowing prisoners to possess nude photos of loved ones and the increased probability of violence among prisoners. *Supra.* Increased violence among inmates has a direct adverse affect on the inmates involved, and a ripple effect on other inmates, prison staff and prison resources. *See generally Turner,* 482 U.S. at 90, 107 S.Ct. at 2262 ("When the accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials."). Violent encounters among inmates drain prison resources quelling unrest and disciplining offenders. Furthermore, any increase in the level of prison violence unnecessarily risks lighting a spark in an environment in which there is no dearth of short fuses.

■ 4. Finally, as to *Turner's* fourth prong, we find that obvious, easy alternatives to the policy do not exist. The alternative suggested by Giano—allowing possession, but prohibiting inmates from displaying the personal photos in their cell and from distributing them to other prisoners, *see Pepperling,* 678 F.2d at 790–91,—imposes more than a *de minimis* cost on the state's valid penological concerns. It cavalierly disregards the informed judgment of prison officials regarding the ease with which such photos could fall into other inmates' hands and lead to violence. Moreover, after *Turner,* there is no requirement that prison officials adopt the least restrictive alternative to their preferred policy. *Turner,* 482 U.S. at 90–91, 107 S.Ct. at 2262. We further note that the prison's policy is not an "exaggerated response" to the problem (such as prohibiting all erotica might be), since other well-run prison systems, including the Federal Bureau of Prisons, have enacted similar policies to promote security and decrease the risk of violence. *See, e.g., Thomas,* 1990 U.S. Dist. LEXIS 17084, at *10–*11.

In addition, the administrative simplicity of Clinton's rule contrasts sharply with the difficult line-drawing of alternatives: the more hardened the convicts, the greater the danger of violence should the photos fall into the wrong hands. In minimum security prisons, the open atmosphere facilitates easy access to other inmate's pictures. Alternative policies involve administratively cumbersome line-drawing regarding the extent of the "right" to possess these photos and to whom the protection applies. For example, does the right apply to particularly degenerate or gruesome photographs? Should it be limited to spouses or extend to girlfriends, to a particular number of girlfriends, or lovers of the same sex as the inmate?

## II. *Giano's Remaining Claims*

In his brief, Giano mentions without elaboration the alternate arguments that Clinton's policy (1) violates the equal protection clause

and (2) is unconstitutionally vague. Both claims are meritless.

 The equal protection clause directs state actors to treat similarly situated people alike. *See Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). To prove an equal protection violation, claimants must prove purposeful discrimination, *see McCleskey v. Kemp,* 481 U.S. 279, 292, 107 S.Ct. 1756, 1767, 95 L.Ed.2d 262 (1987), directed at an identifiable or suspect class. *See Kadrmas v. Dickinson Pub. Schs.,* 487 U.S. 450, 457–58, 108 S.Ct. 2481, 2487, 101 L.Ed.2d 399 (1988). Here, Giano presents no evidence that the policy discriminated against a particular class of inmates. In fact, Clinton's policy was applied to all inmates. Thus, Giano's equal protection claim fails.

 A statute is unconstitutionally vague if persons of common intelligence must necessarily guess at its meaning and differ as to its application, *see Connally v. General Constr. Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926), or if it fails to give a person of ordinary intelligence fair notice of conduct proscribed or required by the regulation, *see United States v. Harriss,* 347 U.S. 612, 617, 74 S.Ct. 808, 811–12, 98 L.Ed. 989 (1954), and encourages arbitrary and erratic behavior on the part of officials charged with enforcing the rule. *See Papachristou v. City of Jacksonville,* 405 U.S. 156, 162, 92 S.Ct. 839, 843, 31 L.Ed.2d 110 (1972).

Clinton's policy plainly proscribed nude or semi-nude photographs of wives or girlfriends. In reviewing the policy, CORC defined "nudity" as:

> [T]he showing of the human male or female genitals, pubic area or buttocks with less than a full opaque covering, or the showing of the female breast with less than a fully opaque covering of any portion thereof below the top of the nipple, or the depiction of covered male genitals in a discernibly turgid state.

Defs. Mot. for Summ. J., Ex. B., Grievance No. FCF–10346–91 (citing N.Y. Penal Law § 245.10). A person of ordinary intelligence would understand this policy. Accordingly, we find that the prison policy is not unconstitutionally vague.

## CONCLUSION

In the prison context, courts applying *Turner* have routinely sanctioned restrictions similar, and in some cases identical, to the one we uphold today. Moreover, the distinction between commercial and non-commercial nude photographs inures to the inmate's benefit. Instead of banning all erotica, prison officials have prohibited only the sexually explicit material with the greatest likelihood for causing violence and disorder within the prison system. Their reward for forging a compromise policy that allows prisoners access to some sexually explicit material is this lawsuit. Perhaps it is true, after all, that no good deed goes unpunished.

The dissent's suggestion that our affirmance of a prison regulation barring certain naked pictures from the prison puts us on the damnable path to *Korematsu v. United States,* 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944) (upholding an executive order that excluded citizens of Japanese ancestry from restricted areas of the West coast and placed them in relocation centers), is a lyric leap. Courts do not exist to rubber stamp bureaucratic excesses. There is a point where judicial deference to executive or administrative expertise must be denied. Nude pictures of loved ones in a prison setting do not begin to approach that point.

Because Clinton's policy is rationally related to the legitimate penological concerns of maintaining security and minimizing violence in the prison setting, and because the policy only minimally burdens Giano's First Amendment freedoms, we affirm the decision of the district court granting defendants' motion for summary judgment.

AFFIRMED.

CALABRESI, Circuit Judge, dissenting:

This case is not about nude pictures. Nor is it about *cartes de visites* and fanciful visions of a Victorian civility that probably never existed and would, even if it had, have little to do with prison life in twentieth-

century America.[1] Finally, it is not about whether the judgment of prison officials to let prisoners have trashy magazines is a good deed that should be rewarded. It is, instead, about the evidence that is required before a court may rule, on a motion for summary judgment, without a trial or evidentiary hearing, that a prison regulation is consistent with inmates' constitutional rights.[2] As Justice Stevens has observed, what most often really matters in reviewing a prison regulation is "the actual showing that the court demands of the State in order to uphold the regulation." *Turner v. Safley*, 482 U.S. 78, 100, 107 S.Ct. 2254, 2267, 96 L.Ed.2d 64 (1987) (Stevens, J., concurring in part and dissenting in part). By affirming the grant of summary judgment on a record that is embarrassingly bare, the majority permits the upholding of contestable regulations without requiring *any* showing by prison officials. Because such an approach is both unwise and contrary to established precedents, I respectfully dissent from the majority's disposition of Giano's First Amendment claim.

The Supreme Court has made clear that a prison regulation that affects inmates' constitutional rights "is valid if it is reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89, 107 S.Ct. at 2261. As the majority notes, the High Court chose to adopt this "reasonableness" standard—rather than any of several other available and more demanding tests—in order to make sure that courts would not readily substitute their views for the considered judgments of prison administrators. *See O'Lone v. Shabazz*, 482 U.S. 342, 349, 107 S.Ct. 2400, 2404, 96 L.Ed.2d 282 (1987) ("To ensure that courts afford appropriate deference to prison officials, we have determined that prison regulations alleged to infringe constitutional rights are judged under a 'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of fundamental

constitutional rights."); *see also Turner*, 482 U.S. at 84–89, 107 S.Ct. at 2259–62; *Thornburgh v. Abbott*, 490 U.S. 401, 407–14, 109 S.Ct. 1874, 1878–82, 104 L.Ed.2d 459 (1989).

But once the strictness of our review has been lessened—out of proper respect for the informed judgments of officials who are responsible for prison safety and discipline—to a standard of "reasonableness," we must be especially careful not to permit additional incantations of "deference" to lead us automatically to accept unsubstantiated assertions that a prison regulation is "reasonable." As Justice Blackmun warned in *Block v. Rutherford*, 468 U.S. 576, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984), courts must not let "the rhetoric of judicial deference [substitute] for meaningful scrutiny of constitutional claims in the prison setting." *Id.* at 592–94, 104 S.Ct. at 3235–36 (Blackmun, J., concurring in the judgment). For "deference to the administrative expertise and discretionary authority of correctional officials must be schooled, not absolute," *Campbell v. Miller*, 787 F.2d 217, 227 n. 17 (7th Cir.), *cert. denied*, 479 U.S. 1019, 107 S.Ct. 673, 93 L.Ed.2d 724 (1986), and "*carte blanche* deference [is] improper." *Thornburgh*, 490 U.S. at 422, 109 S.Ct. at 1886 (Stevens, J., concurring in part and dissenting in part) (explaining the Supreme Court's holding).

I have no argument with the majority that we should "accord substantial deference to the informed judgment of prison officials on matters of prison administration," *ante* at 1055, and I would find its holding quite tenable had the defendants responded to this action "with edifying and illuminating rejoinders drawn from their unique expertise." *Williams v. Lane*, 851 F.2d 867, 886 (7th Cir.1988) (Flaum, J., concurring), *cert. denied*, 488 U.S. 1047, 109 S.Ct. 879, 102 L.Ed.2d 1001 (1989). My problem is that the record developed below demonstrates that the prison officials' judgment in this case was

1. Romanticized images of Victorian propriety have been debunked in numerous historical accounts of the period. *See, e.g.,* John D'Emilio & Estelle B. Freedman, *Intimate Matters: A History of Sexuality in America* 112–138 (1988).

2. It is not for us to say whether correspondence of this sort raises First Amendment issues—for

the Supreme Court has repeatedly held that First Amendment interests are implicated by regulations relating to prisoner mail. *See Thornburgh v. Abbott*, 490 U.S. 401, 407–14, 109 S.Ct. 1874, 1878–82, 104 L.Ed.2d 459 (1989); *Procunier v. Martinez*, 416 U.S. 396, 405–14, 94 S.Ct. 1800, 1807–12, 40 L.Ed.2d 224 (1974).

anything but *informed*, and was instead little more than a knee-jerk reaction, a set of "reflexive, rote assertions that existing conditions are dictated by security concerns and that the cost of change is prohibitive". *Id.* During discovery, for example, Giano asked defendant Senkowski, the Superintendent of the Clinton Facility, about the decision by the Central Office Review Committee ("CORC") that non-commercial nude photographs posed security risks. (This was, it is important to remember, the sole justification for the policy to exclude such pictures.) Senkowski replied: "I have no personal knowledge of the specifics considered by CORC when they make their final determinations." Interrog. Resp. by Senkowski, Pl. Mot. for Summ. J., Ex. C, at 2. Similarly, when Giano asked Senkowski and defendant Coughlin, the Commissioner of the Department of Correctional Services, about the number of misbehavior reports that had resulted from the possession of non-commercial nude photographs, both responded: "I have no personal knowledge." *Id.;* Interrog. Resp. by Coughlin, Pl. Mot. for Summ. J., Ex. D, at 2.

The Supreme Court has assured us that the "reasonableness" standard is not "toothless." *See Thornburgh,* 490 U.S. at 414, 109 S.Ct. at 1882. And the precedents that bind us demonstrate what is meant by having "teeth." The Supreme Court and this Court have always looked to, and in effect required, a complete factual record before passing on the "reasonableness" of a prison regulation. In *Turner,* for example, the High Court, in finding one set of prison regulations constitutionally valid and another set invalid, relied heavily on the extensive evidence developed in full trials. *See* 482 U.S. at 91–99, 107 S.Ct. at 2262–67. Similarly, in *Thornburgh,* the Supreme Court based its ruling on findings of a district court that were the result of a lengthy bench trial. *See* 490 U.S. at 403, 414–19 & n. 12, 109 S.Ct. at 1876, 1882–85 & n. 12. And in *Fromer v. Scully,* 874 F.2d 69 (2d Cir.1989), we did the same. *See id.* at 71–76; *see also Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir.) (reversing a grant of summary judgment because "the district court should not have dismissed appellant's first amendment claim without requiring prison officials to establish the basis for the first amendment restrictions imposed"), *cert. denied,* 492 U.S. 909, 109 S.Ct. 3224, 106 L.Ed.2d 573 (1989).

Other Circuits have done no less. Thus, in *Reed v. Faulkner,* 842 F.2d 960 (7th Cir. 1988), the Seventh Circuit refused to uphold a prison regulation on hair length, even though it was "plausibly supported by considerations of safety and security," because prison officials had yet to present any evidence of danger. *Id.* at 962–64. Judge Posner, writing for the Court, would not permit this prison rule to be defended through "the piling of conjecture upon conjecture," even though other courts had upheld similar regulations. *Id.* at 963. Similarly, in *Whitney v. Brown,* 882 F.2d 1068 (6th Cir.1989), the Sixth Circuit rejected a prison restriction on religious gatherings when a hearing revealed that officials could not produce any evidence and could provide only "a flurry of disconnected and self-conflicting points" to support the regulation. *Id.* at 1074.

The majority's willingness to accept a summary judgment disposition of Giano's First Amendment claim, instead, completely ignores the real possibility that evidence developed over the course of a trial (or some other hearing) might demonstrate that the regulation in question is not "reasonably related to legitimate penological interests." *See Turner,* 482 U.S. at 97–99, 107 S.Ct. at 2266–67 (repeatedly stressing that "the record," developed in a trial before the district court, revealed that a bar on marriages was not reasonably related to the purported interests put forth by officials); *Williams,* 851 F.2d at 872, 881 (finding a prison regulation invalid after a trial revealed "inconsistencies and contradictions" in prison officials' statements, which led their "explanations for security concerns [to be] discredited").

Admittedly, there are regulations so obviously related to legitimate penological concerns that challenges to them may be dismissed at the summary judgment stage based simply upon an (irrefutable) "common sense determination." *Ante* at 1055. For example, the federal regulation that bars inmates in federal prisons from receiving publi-

cations that depict "procedures for the construction or use of weapons, ammunition, bombs or incendiary devices," 28 C.F.R. § 540.71(b) (1992), is so plainly necessary for prison security that no genuine issue of material fact can be raised as to its reasonableness. That some regulations are indisputably valid does not mean, however, "that anything prison officials can justify is valid because they have somehow justified it," *Whitney,* 882 F.2d at 1074, nor does it mean that summary judgment is appropriate every time prison officials can articulate a possible but unsupported foundation for a contested regulation.

In seeking to demonstrate that common sense supports summary judgment here, the majority cites several decisions from other Courts of Appeals. In fact, these cases do not help the majority. Only one, *Trapnell v. Riggsby,* 622 F.2d 290 (7th Cir.1980), is a full opinion, and there the "assaultive background of Marion's inmates" was stressed to uphold a regulation similar to that at issue here. *Id.* at 292–94. In this case, instead, there is nothing in the record to indicate any special risks that might serve to buttress the regulation's reasonableness. The other appellate decisions are all unpublished orders, which, notwithstanding the majority's claim to the contrary, *ante* at 1055, specifically constitute no more than " 'a restricted railroad ticket, good for this day and train only.' " *See, e.g.,* 7th Cir.R. 53(2)(iv) (explaining that unpublished orders "shall not be cited or used as precedent" in any court within the circuit); 9th Cir.R. 36–3 (same). More important, all but one of these cases do not appear to be apposite.

In *Furrow v. Magnusson,* No. 91–1585, 1992 WL 73154 (1st Cir. Apr. 10, 1992), the First Circuit upheld the confiscation of non-commercial nude photographs because they were taken while the inmate's girlfriend was visiting him: "the seized photographs were obtained in violation of valid prison rules, which bar excessive ... physical displays which could be offensive to others during visits[, and] confiscation ... reasonably served the prison's interest in ensuring that its rules are observed." *Id.* at **1. In *Bullock v. McGinnis,* No. 92–2860, 1993 WL

533325 (7th Cir. Dec. 21, 1993), the Seventh Circuit, after highlighting that its *Trapnell* decision relied on "the assaultive background of [the] particular prison's inmates," simply upheld prison officials' decision to confiscate a non-commercial nude photograph from a specific prisoner who had "convictions of deviate sexual assault and aggravated kidnapping." *Id.* at **4. And in *Davis v. Yohey,* No. 91–16208, 1992 WL 389253 (9th Cir. Dec. 22, 1992), the prisoner did "not challenge the merits of the district court's decision" that the prison rule was valid. *Id.* at **3. In other words, each of these cases was properly decided by summary order precisely because each turned on particular facts and circumstances, and all were different from ours.

The only Court of Appeals decision that seems on point is the Sixth Circuit's unpublished order in *Patterson v. Koehler,* No. 83–1278, 718 F.2d 1100, 1983 U.S.App. LEXIS (6th Cir. Aug. 29, 1983), "applying *Trapnell* to uphold [a] prison policy" like the one before us. But the fact that one appellate court in an unreported decision (which relies only on a quite different case from another circuit) would uphold a prison rule barring these pictures at summary judgment hardly makes the regulation "common sense." Rather, it underscores how easy it is for courts occasionally to yield thoughtlessly to claims of necessity by those in authority. In *Patterson,* a prisoner making an earnest and not trivial claim (never previously addressed fully by his circuit's Court of Appeals) that his constitutional rights had been violated was not only denied a chance to prove his claim at trial, but was not even given a fully reasoned explanation as to why his claim was rejected. It is hard to give much weight to such an unpublished conclusion.

In the end, the most that can be said is that the notion that non-commercial nude photographs may present unique security risks is a plausible supposition. But it is also plausible that these pictures might diminish violence by mollifying prisoners or that they might have no effect either way. We just do not know, and the defendants have presented no evidence beyond self-serving assertions. Since the prison rule remains in effect until it

is shown to be unconstitutional, however, we create no risks to discipline by requiring a full examination of the facts. And I cannot discern a sound reason blindly to take as true speculations about a link between non-commercial nude photographs and inmate violence and to deprive Giano of the opportunity to demonstrate that no such link actually exists.

The majority, moreover, accepts wholesale and without question the unsubstantiated assertions of prison officials that Giano's suggested alternative to a complete ban on non-commercial nude photographs—allowing possession of the pictures but prohibiting their display or distribution—is not workable. But the officials have not submitted one iota of evidence as to why such an alternative is unworkable, while commentators and courts have, instead, reached the opposite conclusion. *See Pepperling v. Crist*, 678 F.2d 787, 790–91 (9th Cir.1982) (indicating that a prohibition on displaying non-commercial nude photographs can be a viable alternative to a complete ban); Michael B. Mushlin, *Rights of Prisoners* 231 (2d ed. 1994) ("It is difficult to understand how an intolerable risk of disorder is posed [by non-commercial nude pictures] when there exists the easily available alternative of prohibiting the display of the photographs.").

What is more, there are any number of other alternatives to a complete ban on non-commercial nude photographs (besides the one Giano suggests) that may turn out to be feasible—*e.g.*, allowing inmates to be sent photographs but providing that the pictures may be seen only at appointed places, or allowing photographs to be received and seen for a brief time before they must be re-turned. *Cf. Dawson v. Scurr*, 986 F.2d 257 (8th Cir.) (discussing a regulation that allowed inmates access to sexually explicit materials just in reading rooms), *cert. denied*, —— U.S. ——, 114 S.Ct. 232, 126 L.Ed.2d 187 (1993). Since the defendants have not come close to "demonstrat[ing] that they have rejected a less restrictive alternative because of reasonably founded fears that it will lead to greater harm," they have plainly not "succeed[ed] in demonstrating that the alternative they in fact selected was not an 'exaggerated response' under *Turner*." *Thornburgh*, 490 U.S. at 419, 109 S.Ct. at 1885.

On this record, therefore, it is hard to conclude that "the accommodation here has more than a de minimis effect on valid penological interests." *Benjamin v. Coughlin*, 905 F.2d 571, 577 (2d Cir.) (citing *Turner*, 482 U.S. at 91, 107 S.Ct. at 2262), *cert. denied*, 498 U.S. 951, 111 S.Ct. 372, 112 L.Ed.2d 335 (1990). Giano may well face an uphill battle in seeking to show that a total ban on non-commercial nude photographs is unreasonable and has only a minimal effect on penological interests. But he should have the chance to climb that hill and fight that battle.[3]

The Supreme Court has told us that the Constitution does not stop at the prison door. *See Procunier v. Martinez*, 416 U.S. 396, 405–06, 94 S.Ct. 1800, 1807–08, 40 L.Ed.2d 224 (1974). As a result, today's holding—at the summary judgment stage when we must view all evidence and draw all inferences in Giano's favor—that the prison regulation at issue here does not violate Giano's First Amendment rights cannot be read simply as

---

**3.** The majority is correct that in this circuit, after *Fromer, see* 874 F.2d at 74, Giano "bears the burden of proving that the disputed regulation is unreasonable." *Ante* at 1054. And this is so even though the Supreme Court has avoided deciding the question of who has the ultimate burden of proof, *see Thornburgh*, 490 U.S. at 414 n. 12, 109 S.Ct. at 1882 n. 12, and has simply indicated that prison officials are not required to demonstrate the unreasonableness of *all* the possible alternatives to a challenged regulation. *See O'Lone*, 482 U.S. at 350, 107 S.Ct. at 2405; *Turner*, 482 U.S. at 90–91, 107 S.Ct. at 2262–63. There are, however, any number of ways in which Giano might go about showing that "the

logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational." *Turner*, 482 U.S. at 89–90, 107 S.Ct. at 2262. He might, for instance, be able to show that penal institutions without a ban on non-commercial nude photographs have experienced fewer incidents of inmate violence than those with such a ban. Or he might demonstrate that other penal institutions have adopted less restrictive regulations with no adverse effects. In any event, the fact that it is up to Giano to make such a showing cannot support a decision that precludes him from trying.

another way of saying that prisoners really have no *prima facie* constitutional right to receive correspondence of this sort. For this reason, the holding goes far beyond endangering the rights of prisoners. If the jail house is not what justifies reliance on unsubstantiated assertions, who is to say when such assertions are to be taken as gospel and when they are not?

Nor can one count on those in authority to limit their use of conjecture to cases in which prisoners are involved. There are unfortunately all too many examples which do not involve prisoners and which, in retrospect, turned out to be utterly wrong. Even were we inclined, therefore, complacently to accept restrictions on prisoners, we could not dismiss this holding as affecting only them. The Pentagon Papers case is one celebrated instance in which the Supreme Court courageously resisted such scare tactics in the absence of proof. *See New York Times Co. v. United States,* 403 U.S. 713, 714, 91 S.Ct. 2140, 2141, 29 L.Ed.2d 822 (1971) (holding that the Government had not met its "burden of showing justification" for a prior restraint on the publication of documents related to the Vietnam war).[4] Conversely, *Korematsu v. United States,* 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944), is the most tragic example of judicial failure to require facts before infringing on admitted constitutional rights. It is also an especially apt instance, for the Supreme Court has itself come to recognize that it was the dissenters in that case who had it right. *See City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 501, 109 S.Ct. 706,

725, 102 L.Ed.2d 854 (1989) (citing Justice Murphy's dissent in *Korematsu* to support the proposition that "blind judicial deference to legislative or executive pronouncements of necessity" is inappropriate).

What is involved here may well be very small in comparison to what was at stake in *Korematsu* or in the Pentagon Papers case, but the principle is the same. Words are cheap and facts are often surprising and always essential. Whenever the validity of claims by those in authority is measured through surmise, prejudgment and intuition in summary settings rather than through data demonstrated at leisure, the constitutional freedoms of us all are put in peril.[5]

---

4. Erwin N. Griswold, who argued as Solicitor General in support of an injunction barring the publication of the Pentagon Papers, later came to agree that the Supreme Court made the right decision in refusing to allow such a prior restraint on the evidence before it. *See* Dennis Hevesi, *Erwin Griswold of Harvard, Ex–Solicitor General, 90,* N.Y. Times, Nov. 20, 1994, § 1, at 58; Erwin N. Griswold, *'No Harm Was Done',* N.Y. Times, June 30, 1991, § 4, at 15.

5. I am only slightly comforted by the majority's reassurance that "[t]here is a point where judicial deference to executive or administrative expertise must be denied." *Ante* at 1057. I do not doubt the majority's sincerity at all. But unfortunately such reassurances have all too often proved vain. Thus, in *American Communications Association v. Douds,* 339 U.S. 382, 70 S.Ct.

674, 94 L.Ed. 925 (1950), the Supreme Court emphasized the narrowness of its decision and stated firmly that, despite its holding that labor union officials could be required to take an oath that they were not members of the Communist party, there would be no wholesale proscriptions of Communists or their party "while this court sits." *See id.* at 404, 410, 70 S.Ct. at 687, 690. Yet after only nine years, as Justice Black detailed in his celebrated dissent in *Barenblatt v. United States,* 360 U.S. 109, 79 S.Ct. 1081, 3 L.Ed.2d 1115 (1959), "Communists or suspected Communists have been denied an opportunity to work . . . in just about any . . . job . . . [and] are singled out and, as a class, are subjected to inquisitions which the Court suggests would be unconstitutional but for the fact of 'Communism.'" *Id.* at 152–53, 79 S.Ct. at 1107. Yet, as he concluded, "this Court still sits!" *Id.*