CHERRY RIVER MUSIC CO., a division of Cherry Lane Music Publishing Company, Inc. and Stephanie Music, a division of Titan Sports, Inc., Plaintiffs,

v.

SIMITAR ENTERTAINMENT, INC., John Does 1–500, and XYZ Corps. 1–500, Defendants,

No. 99 Civ. 1127(LAK).

United States District Court,
S.D. New York.

March 9, 1999.

Tom J. Ferber, Lisa M. Buckley, Hara K. Jacobs, Pryor Cashman Sherman & Flynn, LLP, New York City, for Plaintiffs.

Jonathan D. Reichman, Dana R. Kaplan, Sari B. Granat, Kenyon & Kenyon, New York City, for Defendants.

## OPINION

KAPLAN, District Judge.

In December 1998, plaintiffs, a music publisher and the owner of the World Wrestling Foundation ("WWF"), brought out a compact disk entitled *WWF—The Music, Volume 3* which contains the "entrance themes" of fourteen WWF wrestlers, the copyrights of which all are owned by the plaintiffs. The disk has been quite successful, having shipped a million and sold over 500,000 copies by mid-February.

In late January 1999, defendant Simitar Entertainment, Inc. ("Simitar") brought out its own disk called *Slammin' Wrestling Hits*, which obviously was intended to capitalize on the popularity of WWF wrestlers and, in all likelihood, on the promotion and success of plaintiffs' CD. Al-

though Simitar admittedly has no license to use any of plaintiffs' copyrighted music, thirteen of the fifteen works on its disk are performances of works owned by the plaintiffs, eight of them appearing also on plaintiffs' CD. Plaintiffs, not surprisingly, seek a preliminary injunction barring further distribution of Simitar's product and a recall of goods already shipped.

Given the conceded validity of plaintiffs' copyrights and the admitted absence of any license to reproduce plaintiffs' works, the case presents two central issues. The first is whether plaintiffs are estopped to assert copyright infringement by their responses to Simitar's requests for licenses to use plaintiffs' music. The second, assuming that Simitar is infringing, is whether a recall should be ordered in all the circumstances of the case. The Court has received extensive submissions, conducted an evidentiary hearing on March 5, 1999, and had the benefit of skilled presentations by able counsel specializing in intellectual property matters. In view of the exigency of the matter, it made a ruling from the bench on March 8, 1999 subject to the later filing of this opinion.

### I. Mechanical Licenses Under the Copyright Act

In order to place the current dispute in context, it is helpful to sketch the legal framework that governs the licensing of copyrighted musical compositions, as that framework is the backdrop against which this dispute arose.

As a general proposition, a copyright confers on the owner the exclusive right to reproduce the copyrighted work.[1] Absent a license from the copyright owner, which the owner is free to grant or deny, reproduction of the work by another constitutes copyright infringement. The Congress that enacted the Copyright Act of 1909, however, was concerned that exclusivity with respect to musical compositions would give rise to "a great music monopoly."[2] It

---

1. 17 U.S.C. § 106.

2. H.R. REP. NO. 2222, 60th Cong., 2d Sess. 6 (1909).

therefore modified the principle of exclusivity in the case of nondramatic musical works by enacting a compulsory license provision which, in defined circumstances, imposed upon the copyright owner a license permitting the mechanical recording of the copyrighted song "on such media as a phonograph record or a piano roll." [3] Although recording technology has changed since 1909, licenses to record musical compositions on such media continue to be called "mechanical licenses."

The compulsory mechanical license concept was carried forward in Section 115 of the Copyright Act of 1976 (the "Act") which, generally speaking, permits one wishing to record a copyrighted nondramatic musical work to do so in the absence of the copyright owner's consent in exchange for payment of a statutory royalty.[4] But there are two limitations on the availability of compulsory mechanical licenses that are important in this case.

First, strict time limits must be observed with respect to the procedural formalities of obtaining the compulsory license. Section 115(b)(1) of the Act requires in pertinent part that "[a]ny person who wishes to obtain a compulsory license under this section shall, *before or within thirty days after making, and before distributing* any phonorecords of the work, serve notice of intention to do so on the copyright owner." [5] The consequences of any lapse are severe:

> "Failure to serve or file the notice required by clause (1) *forecloses the possibility of a compulsory license and, in the absence of a negotiated license, renders the making and distribution of phonorecords actionable as acts of infringement . . .*" [6]

In other words, the failure to serve the notice of intention before distributing phonorecords, a term that includes compact disks,[7] before the start of distribution precludes the creation of a compulsory license, and it does so both as to copies distributed prior to service and as to copies distributed thereafter.[8]

Second, compulsory licenses are not available with respect to all nondramatic musical compositions. The statute provides that a license is available only "[w]hen phonorecords of a nondramatic musical work have been distributed to the public in the United States under the authority of the copyright owner . . ." [9] "Unless and until such [public distribution] occurs, the copyright owner's rights in such musical work remain exclusive, *i.e.*, not subject to the compulsory license." [10]

## II. The Current Dispute

### A. The Parties

Plaintiff Cherry Lane Publishing Company, Inc. is a New York music publisher. Cherry River Music is among its divisions. They are referred to without distinction as Cherry Lane.

Titan Sports, Inc. ("Titan") created the WWF, a professional wrestling league, in 1981 to promote live wrestling matches. In addition to promoting live matches, which are attended by thousands of fans and broadcast widely, Titan and its licensees allegedly have exclusive rights to make and sell goods sponsored by the WWF. It promotes the WWF and its wrestlers and claims to have sold "vast amounts" of T-shirts, posters, record albums and other goods featuring the WWF

---

3. *See generally* 2 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 8.04[A], at 8–53 (199 ) (hereinafter NIMMER).

4. *See* 17 U.S.C. § 115 (1996 & Supp.1998).

5. *Id.* § 115(b)(1) (emphasis added).

6. *Id.* § 115(b)(2) (emphasis added).

7. The term "phonorecords" includes compact disks. *See* 17 U.S.C. § 101.

8. 2 NIMMER § 8.04[G][1][*a*], at 8–69 to 8–70.

9. 17 U.S.C. § 115(a)(1).

10. 2 NIMMER § 8.04[C], at 8–57.

name and mark and the names, likenesses and characters of WWF wrestlers.

Between 1991 and 1998, James Alan Johnston, an employee of Titan, composed for the company numerous original compositions which are used as entrance themes for WWF wrestlers including *Stone Cold Steve Austin Theme, Val Venis Theme, Gold Dust Theme,* and the other ten works included on plaintiffs' CD (together, the "Compositions"). Pursuant to a written agreement between Titan and Cherry Lane, Titan granted Cherry Lane an undivided one-half copyright interest in the Compositions and the exclusive worldwide rights to publish, administer and otherwise commercially exploit the Compositions or license others to do so.[11]

On December 1, 1998, plaintiffs released *WWF—The Music* which, as indicated above, met with prompt and substantial success. It is undisputed that plaintiffs own valid, registered copyrights in all of the Compositions.

The record before the Court discloses very little about Simitar. It appears to be a Delaware corporation headquartered in Minnesota. Although it has been around for a number of years, it has been in the business of making and selling phonorecords for only about three years.[12]

### B. Simitar's CD and Efforts to Obtain Licenses

There is no evidence concerning the genesis or early timing of Simitar's plan to bring out *Slammin' Wrestling Hits.* On December 14, 1998, however, Mona Mahlum, Simitar's manager of copyright administration and the person responsible for obtaining mechanical licenses and getting correct information for the purpose of crediting copyright owners on album covers, received a list of works that Simitar intended to use on its forthcoming CD. In accordance with her usual practice, she checked web sites maintained by ASCAP and BMI[13] in order to determine the ownership of the music and learned that Cherry Lane controlled the publishing.[14]

#### 1. Mahlum's December 15 Conversation With Connelly

On December 15, 1998, Mahlum spoke with Michael Connelly of Cherry Lane because she was unsure as to the precise titles of some of the songs.[15] Connelly told her that two of the works about which Simitar inquired, *Bill Goldberg Theme* and *N.W.O. Original Theme,* were controlled by Warner Chappell Music and suggested that she call the song writer directly concerning the other titles.[16]

Mahlum told Connelly of Simitar's plan to use WWF themes on an album. She claims that she said that she would be sending Connelly requests for negotiated mechanical licenses. and that Connelly responded that he would look forward either to receiving them or to doing business.[17] Connelly denies that Mahlum inquired about any licenses and that he said anything to suggest that any such request would be granted.[18]

#### 2. The Negotiated License Requests

On December 21, 1998, Mahlum sent Connelly a form of mechanical license for seven of the Compositions and proposed a

---

11. Connelly Decl. ¶ 3.

12. Darrow Decl. ¶ 3.

13. ASCAP and BMI are performance rights societies which have nonexclusive rights to license nondramatic performances of copyrighted nondramatic musical works of tens of thousands of composers, artists and publishers. *See generally Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 4–5, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979).

14. Tr. 30–31

15. *Id.* 31.

16. Mahlum Decl. ¶¶ 4–6 & Ex. A.

17. *Id.* ¶ 6; Tr. 31–32

18. Connelly Reply Decl. ¶¶ 3–4 & n. 2.

royalty of 75 percent of the statutory rate.[19] The proposal stated "If you are in agreement with the above mentioned terms, please indicate your acceptance by signing in the space provided" and returning a copy.[20] It sought no telephonic or other response. Connelly, who was preparing for an absence for serious medical reasons, neither returned the proposed license nor called Mahlum to tell her that he would not do so.[21] Mahlum, for her part, did not regard the lack of a prompt response as anything out of the ordinary, as others of whom she had requested licenses in the past often had not responded for many weeks.[22]

As December went forward, Mahlum learned that Simitar intended to use thirteen rather than seven of the Compositions. In consequence, on December 29, 1998, she sent Connelly a revised proposed mechanical license listing all thirteen works.[23] Unbeknownst to Mahlum. Connelly was out of the office for medical reasons, did not return to his office until early January, and did not come across the request until some time later.[24] When he did see the proposal, he neither signed it nor called Mahlum to tell her that he would not do so.[25] Mahlum, on the other hand, made no effort to contact Connelly in the interim.

### 3. The January 8 Conversations

On January 8, 1999, Leeanne Lawlor, the paralegal for trademarks and copyrights at Titan, learned that Simitar intended to release *Slammin' Wrestling Hits* and that it contained performances of thirteen of the Compositions of which Titan was a joint owner. She believed, incorrectly, that the Simitar album had been bootlegged—that it contained not only performances of copyrighted music belonging to plaintiffs but that Simitar had rerecorded the performances on plaintiffs' CD.[26] She telephoned Mickey Elfenbein, Simitar's chief executive officer, told him of her understanding of Simitar's plans, said that she had been instructed to send Simitar a cease and desist letter, and asked the status of Simitar's project. Elfenbein told her that he would have Andrew Darrow, Simitar's vice president for business and legal affairs, call her back.

According to Lawlor, Darrow called her back, and Lawlor told him the purpose of her call. Darrow responded that he did not know what the problem was, as Simitar had not copied Cherry Lane's master recordings and was in license negotiations with Cherry Lane. At this point, the accounts of Darrow and Lawlor diverge dramatically and the divergence is the central factual issue in the case.

Darrow's declaration claimed that Lawlor thereupon "withdrew her objection" to the Simitar album, "stating that as long as Simitar was in contact with Connelly, there appeared to be no problem."[27] At the hearing, Darrow admitted that Lawlor did not make that statement[28] and retreated. He acknowledged that Lawlor was displeased about Simitar's album and claimed that he responded by telling her that he would get compulsory licenses if he

---

19. Mahlum Decl. ¶ 8 & Ex. B.

20. *Id.*

21. Connelly Reply Decl. ¶ 5.

22. Tr. 36–37.

23. Mahlum Decl. ¶ 10 & Ex. C.

24. Connelly Reply Decl. ¶ 6.

25. *Id.*

26. The Copyright Act distinguishes between a musical composition and a recording of a performance thereof. The compulsory license provision, for example, does not extend to the duplication of a sound recording by another as opposed to the recording of a different performance of the same musical composition. *See generally* 2 NIMMER § 8.04[E].

27. Darrow Decl. ¶ 10.

28. Tr. 68.

had to do so.[29] By the end of the conversation, he claimed at the hearing, Lawlor "seemed satisfied."[30]

Lawlor told a very different story. She testified that she responded to Darrow's claim that Simitar was in negotiations with Cherry Lane by saying that she would check with Cherry Lane and get back to Darrow. She then called Cherry Lane and learned that there were no negotiations under way, whereupon she telephoned Titan's outside counsel in Pittsburgh, Franklin Molene, as Lawlor previously had not understood compulsory licenses. Molene confirmed that compulsory licenses often were available but told Lawlor that a putative licensee would be foreclosed from obtaining a compulsory license if it did not follow the requisite procedures precisely. Lawlor responded with glee and then, she testified, called Darrow again.[31]

In the second call, according to Lawlor, she told Darrow that she had determined that neither Cherry Lane nor Titan was in negotiations for a license to Simitar and that no such license would be granted. Darrow, she said, was "cocky" and said in substance that Simitar would just get a compulsory license. Lawlor claims to have replied that Titan would be watching and that Simitar would be foreclosed from obtaining a compulsory license if it did not follow the law "to a tee." Darrow, Lawlor testified, responded that he knew the law which provoked Lawlor to say that Titan "would own" Simitar if it did not follow the law.[32]

### 4. The Release of the Simitar Album

By early to mid-January, manufacturing of Simitar's album must have been well under way. The product was shipped on January 19 and distribution commenced on January 26.[33] With the passage of those dates, the possibility that Simitar could obtain compulsory licenses ended under Section 115(b)(2) of the Act.

The release of Simitar's album appears to have had a direct impact on sales of plaintiffs' album. During the week of February 2, 1999, Soundscan, a service which records retail sales of phonorecords, reported that chain stores had sold over 8,000 copies of the Simitar CD while the same stores experienced an unexpected decline in sales of plaintiffs' album.[34]

At this point, both sides manifested concern. Mahlum, who allegedly had become concerned about the lack of mechanical licenses, began telephoning Connelly but did not reach him.[35] Cherry Lane had its counsel send Simitar a letter on February 8, 1999 demanding that it cease and desist distribution of its album.[36] Two days later, *Billboard,* an industry trade publication, noted the sales success of the Simitar release and quoted Simitar's Elfenbein as having said that Simitar had all necessary clearances for the album, which prompted a second cease and desist letter from Cherry Lane's attorneys.[37] On the same date, February 10, Mahlum sent Connelly two more faxes which acknowledged that Simitar had no licenses for the copyrighted music and urged Connelly to sign and return the proposed license that Mahlum had sent him in December.[38] When Mahlum received no response, she finally sent Cherry Lane purported—and concededly untimely and ineffective—notices of compulsory license which Cherry Lane

---

29. *Id.* 51, 69.

30. *Id.* 51.

31. *Id.* 89–91.

32. *Id.* 92–93.

33. Darrow Decl. ¶ 13.

34. Connelly Decl. ¶ 9.

35. Mahlum Decl. ¶ 13; Tr. 39.

36. Connelly Decl. ¶ 10 & Ex. C.

37. *Id.* ¶ 11 & Ex. D.

38. *Id.* ¶ 12 & Ex. E.

promptly rejected.[39]

### 5. The Commencement of this Litigation and Simitar's Related Actions

By February 16, the date on which this action was commenced, Simitar had sold more than 150,000 copies[40] of *Slammin' Wrestling Hits*.[41]

Plaintiffs moved for a preliminary injunction on February 24. Simitar responded by trying to delay the case. It disclosed that it had filed a previously unserved and undisclosed action[42] for a declaratory judgment in Minnesota—obviously in an effort to preempt the choice of forum against the possibility that settlement efforts would prove unsuccessful—and sought to (a) stay consideration of plaintiffs' preliminary injunction motion pending the filing and determination of a motion to transfer this case to Minnesota, and (b) enjoin plaintiffs from moving to dismiss, stay or transfer the Minnesota action. Its application was denied.

In the meantime, Simitar was busy shipping product. The testimony at the hearing indicated that 275,000 copies of the Simitar album were made prior to the making of plaintiffs' motion for a preliminary injunction. An additional 75,000 copies were made and 50,000 to 75,000 copies shipped between the making of the motion and the hearing.[43] At this point, Simitar has few copies left in inventory.[44] Inasmuch as Simitar's evidence shows that only 50,688 copies actually had been sold at retail through February 28, 1999,[45] close to 300,000 copies of *Slammin' Wrestling Hits* are in the hands of wholesalers and retailers around the country.

### III. The Propriety of a Preliminary Injunction

### A. The Preliminary Injunction Standard

A preliminary injunction is proper where the movant demonstrates a material threat of irreparable injury and *either* (a) a likelihood of success on the merits or (b) the existence of serious questions going to the merits as to make the case a fair ground for litigation and that the balance of hardships tips decidedly in favor of the movant. To the extent that the movant seeks a mandatory injunction or substantially all of the relief to which it would be entitled were it to prevail in the action, it must show a "clear" or "substantial" likelihood of ultimate success or that it would suffer "extreme or very serious damage" absent preliminary relief.[46]

---

**39.**  *Id.* ¶ 13 & Exs. G, H.

On February 16, Simitar also sent Cherry Lane a check for $96,417, the amount of the statutory royalties that would have been due on Simitar's sales through the end of January if Simitar had obtained compulsory licenses. Cherry Lane promptly returned the check. Darrow Decl. ¶ 19.

**40.**  Darrow Decl. ¶ 19 & Ex. F, at 2. Darrow's declaration says that the royalty figures reflect sales "since the album's release," thus suggesting that sales figure was through the date of his royalty check, February 16. Both the royalty check and the sales tabulation in the exhibit, however, indicate that the sales listed were for the month of January.

**41.**  Simitar's distribution system is complex, involving sales almost exclusively to intermediaries of one kind or another, many of which sell to other distributors further down the chain. *See* Tr. 61, 99–101.

**42.**  Reichman Decl., Feb. 24, 1999, ¶¶ 3 (process not served), 5 (if plaintiffs had not ob-

tained their order to show cause *ex parte*, Simitar would have "disclosed the existence of the . . . Minnesota Action").

**43.**  Tr. 63–64.

**44.**  *Id.* 63

**45.**  A Soundscan report for the month of February shows that 50,688 copies had been sold at retail through February 28. Darrow Decl. ¶ 20 & Ex. G; Connelly Decl. ¶ 9 (Soundscan measures retail sales). This is consistent with Darrow's contention that about 6,000 copies were sold in the first week following release (i.e., the last week in January) and about 11,000 copies per week since. Darrow Decl. ¶ 20.

**46.**  *E.g., Malkentzos v. DeBuono*, 102 F.3d 50, 54 (2d Cir.1996); *Jolly v. Coughlin*, 76 F.3d 468, 473 (2d Cir.1996); *Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 33–34 (2d Cir.1995); *Abreu v. Callahan*, 971 F.Supp. 799, 821 (S.D.N.Y.1997).

## B. Irreparable Injury

■ Irreparable injury ordinarily is presumed once a *prima facie* case of copyright infringement is established, as the copyright owner is entitled to the exclusive right to reproduce the copyrighted work and the determination of damages caused by infringements typically is extremely difficult.[47] Here, it is undisputed that the plaintiffs have valid, registered copyrights and that defendant has reproduced the copyrighted compositions without a license, thus infringing the copyrights absent the existence of some defense in bar. In consequence, irreparable injury is presumed.

Simitar resists this conclusion on two contentions. First, it argues that plaintiffs are barred from preliminary relief on a theory of unclean hands because they allegedly knew of Simitar's plans yet voiced no objection until after expiration of the time within which Simitar could have obtained compulsory licenses. In any case, they argue, damages are an adequate remedy.

Simitar's unclean hands argument is misdirected and, in any case, unpersuasive. It is misdirected because it goes to plaintiffs' likelihood of success on the merits, not to the quite distinct issue of whether defendant's actions threaten plaintiffs with irreparable injury. And it is unpersuasive, even putting aside Simitar's disputed factual premises, because it is far from clear that Simitar could have obtained all of the necessary compulsory licenses. While compulsory licenses could have been obtained for eight of the Compositions used on the Simitar album, plaintiffs argue that five of the Compositions Simitar is using never have been recorded and distributed to the public by plaintiffs or persons authorized by them to do so.[48] Those five works, more than one third of the alleged-

ly infringing material, are not subject to the compulsory license provision of the Act,[49] so their reproduction by Simitar clearly threatens plaintiffs with irreparable injury even if plaintiffs are precluded from making such a claim with respect to the other works. While Simitar rejoins that plaintiffs could be compensated for that infringement by damages equal to the statutory royalty, the suggestion ignores the fact that plaintiffs have an absolute right to refuse to allow reproduction of those works. The adoption of Simitar's suggestions, moreover, effectively would change the careful legislative compromise that is embodied in Section 115 of the Act by having the courts impose what amounts to a compulsory license where Congress refused to do so.

In consequence, the Court concludes that plaintiffs are threatened with immediate and irreparable injury.

## B. Likelihood of Success on the Merits

In this case, the elements of copyright infringement—the existence of valid, registered copyrights and defendant's reproduction of the copyrighted works, the musical compositions—are conceded. Plaintiffs therefore will prevail in this case unless Simitar establishes an affirmative defense. The defense of choice, variously characterized as estoppel and as unclean hands, is that Simitar relied on actions by plaintiffs that led it to believe that negotiated licenses would be forthcoming and therefore allowed the time within which it could have obtained compulsory licenses on at least eight of the Compositions to expire without taking the necessary steps. Simitar argues that there was a course of dealing between it and Cherry Lane, as well as a custom

---

47. *See, e.g., ABKCO Music, Inc. v. Stellar Records, Inc.*, 96 F.3d 60, 64 (2d Cir.1996); *Hasbro Bradley, Inc. v. Sparkle Toys, Inc.*, 780 F.2d 189, 192 (2d Cir.1985).

48. Connelly Decl. ¶ 14.

49. Simitar claimed at the hearing that two or three of the five compositions would have been subject to compulsory licenses. *See* Tr. 141. The claims were unsubstantiated by evidence and, in any case, do not address all of the allegedly infringed works.

and usage in the trade, under which it and other record companies send requests for mechanical licenses to music publishers, distribute their albums without the requests having been answered and without objection by the publishers, and then eventually receive the signed requested licenses weeks or months later. It maintains that it relied upon Cherry Lane's failure to object to its proposed album or to indicate that negotiated licenses would not be granted between December 15, when Mahlum told Connelly of Simitar's plan, and the latest date by which it could have filed for compulsory licenses.[50] In view of this reliance, it asserts, plaintiffs are estopped or otherwise precluded from obtaining a preliminary injunction.

As the Nimmers have written, "[p]rinciples of estoppel applicable elsewhere in the law are equally applicable in copyright infringement actions."[51] In order to prevail on the defense, the accused infringer must demonstrate that (1) the plaintiff knew of and manifested acquiescence in the defendant's infringing conduct, actual or proposed, (2) the plaintiff intended that the defendant rely on its conduct, and (3) the defendant reasonably relied to its detriment on the plaintiff's actions.[52] Here it seems likely that Cherry Lane was told something about Simitar's plans in the December 15, 1998 telephone conversation

between Mahlum and Connelly and in a follow-up memorandum by Mahlum on the next day.[53] While it is not clear whether Cherry Lane knew all of Simitar's plans in detail, the Court assumes that Simitar will satisfy the first element of its estoppel defense. The substantial dispute between the parties is whether Cherry Lane did anything which, in all the circumstances, led Simitar to fail to file for compulsory licenses and, if so, whether Simitar was justified in relying to its detriment on Cherry Lane's actions. This turns on the alleged course of dealing and custom and usage and on the hotly disputed contents of the Mahlum–Connelly conversation of December 15 and the Lawlor–Darrow conversations of January 8.

### 1. Prior Dealings and Alleged Industry Custom

■ The alleged prior course of dealings between the parties and the alleged custom and usage in the trade are weak reeds upon which to rest Simitar's defense. There was little factual support for the alleged prior course of dealing.[54] There was some evidence, albeit far from conclusive, that some music publishers often are slow in dealing with negotiated license requests, that some record companies release albums after requesting but before receiving negotiated licenses, and that the some publishers often sign the negotiated

---

**50.** It is unnecessary to decide whether the right to obtain compulsory licenses expired upon shipment (January 19) or release (January 26) of Simitar's album in order to determine this motion.

**51.** 4 NIMMER § 13.07.

**52.** See, e.g., Buttry v. Gen. Signal Corp., 68 F.3d 1488, 1493 (2d Cir.1995); United States v. King Features Ent., Inc., 843 F.2d 394, 399 (9th Cir.1988); Chi–Boy Music v. Charlie Club, Inc., 930 F.2d 1224, 1228–29 (7th Cir. 1991); Lottie Joplin Thomas Trust v. Crown Publishers, Inc., 456 F.Supp. 531 (S.D.N.Y. 1977), aff'd, 592 F.2d 651 (2d Cir.1978); Encyclopedia Brown Productions, Ltd. v. Home Box Office, Inc., No. 91 Civ. 4092(PKL), 1998 WL 734355, at *13 (S.D.N.Y. Oct.15, 1998); 4 NIMMER § 13.07..

**53.** DX A.

**54.** The Second Circuit has explained that a prior course of dealings material for contract purposes exists when the parties have a "well-established custom" established in "numerous purchases over a period of time." New Moon Shipping Co. v. Man B & W Diesel, 121 F.3d 24, 31 (2d Cir.1997); see also Pervel Industries, Inc. v. T M Wallcovering, 871 F.2d 7, 8 (2d Cir.1989). Here, Simitar on three previous and unrelated occasions had requested mechanical licenses from Cherry Lane and later received signed negotiated licenses. Tr. 27–29. But three unrelated transactions over a three year period are insufficient to establish a course of dealing in the sense the term is used in the law.

licenses without objection after such releases.[55] But the argument is without merit.

■ While industry custom and usage or a prior course of dealing between the parties is relevant to determining the meaning of a contract, it "cannot create a contract where there has been no agreement by the parties ..."[56] Simitar rejoins that it offers the alleged prior course of dealing and industry custom not to prove that the parties formed a contract but to demonstrate that it was entitled to assume that Cherry Lane would grant licenses absent some clear expression to the contrary. But that argument is flawed for several reasons.

First, as a purely factual matter, putting aside for the moment the two disputed conversations, Simitar had no reason to assume that Cherry Lane's silence in response to its license requests reflected acquiescence because Simitar did not even know that its requests had come to the attention of the relevant person at Cherry Lane, Connelly. Mahlum simply faxed requests on December 21 and 29 without calling to determine whether Connelly was there to receive them during the holiday season and without following up on the requests at any time prior to Simitar's release of its infringing album on January 26. As she admitted at the hearing, she did not even know whether Connelly was dead or alive.[57] And while Connelly still is very much with us, in fact he was out of the office for medical reasons for a part of the relevant period.

Second, Simitar was or should have been aware that the alleged industry custom

and usage probably had no relevance here because Simitar's request for negotiated licenses was something quite out of the ordinary. Simitar's expert testified at the hearing that the practice of record companies releasing albums without first having received responses to license requests, to whatever extent there is such a practice, rests on the fact that the copyright owners usually are music publishers whose interests are served by granting licenses freely in order to maximize their royalty revenues.[58] Here, however, Titan was a co-owner of the copyrights for the music in question. Titan's interest was quite different from that of a music publisher. Unlike a music publisher, Titan would be directly and adversely affected by a diversion of sales from its album to Simitar's. It therefore had every incentive to withhold, or persuade Cherry Lane to withhold, licenses from Simitar. Moreover, Titan's interest in the copyright was open and notorious, as Titan was listed as the copyright proprietor in the copyright notice on the album liner of *WWF—The Music,* which had been released on December 1, 1998 and was the very album with which Simitar's *Slammin' Wrestling Hits* was intended to compete. In these circumstances, Titan knew or, at least, should have known that the usual industry practice, if indeed there is one, would not necessarily be followed. It had every reason to suppose that it would receive no cooperation in its effort to introduce an album competitive with *WWF—The Music.*

Third, much the same argument that Simitar makes here has been rejected before. In *Leo Feist, Inc. v. Apollo Records, N.Y. Corp.,*[59] the defendant record compa-

---

**55.** Tr. 11–14.

**56.** *Stulsaft v. Mercer Tube & Mfg. Co.,* 288 N.Y. 255, 260, 43 N.E.2d 31 (1942) (custom and usage). *Accord, e.g., Tilley v. Cook County,* 103 U.S. 155, 160, 26 L.Ed. 374 (1880) (custom and usage); *Fasolino Foods Co. v. Banca Nazionale del Lavoro,* 761 F.Supp. 1010, 1021 (S.D.N.Y.1991) (prior course of dealing), *aff'd,* 961 F.2d 1052 (2d Cir.1992); *Grombach Productions v. Waring,* 293 N.Y. 609, 616, 59 N.E.2d 425 (1944) (prior course

of dealing); *see Best Brands Bev., Inc. v. Falstaff Brewing Corp.,* 842 F.2d 578, 590 (2d Cir.1987) (custom and usage).

**57.** Tr. 45.

**58.** *See Id.* 17–18.

**59.** 300 F.Supp. 32 (S.D.N.Y.), *aff'd,* 418 F.2d 1249 (2d Cir.1969), *cert. denied,* 398 U.S. 904, 90 S.Ct. 1694, 26 L.Ed.2d 63 (1970).

ny used plaintiffs' copyrighted musical compositions on a phonorecord without a negotiated license and, because its compulsory license filing was late, without a compulsory mechanical license. Although the record company admitted its liability for infringement, it argued that no substantial penalties should be imposed upon it because it the industry customarily filed late for compulsory licenses. But the court rejected the argument, stating that "it is not [an] excuse that the defendants relied upon a custom or trade practice of awaiting completion of manufacture and distribution of a recording before filing a notice of intention to use copyrighted material . . ." [60]

In the last analysis, then, the defense of estoppel, to the extent it depends upon alleged industry custom and usage or the alleged prior course of dealings between the parties, runs aground on the time honored principle that the reliance upon which an estoppel is said to arise must be reasonable and justified.[61] Focusing solely on the alleged custom and prior dealings, without regard for the moment to the two conversations, the Court finds that Simitar's alleged reliance on the assumption that a negotiated license would be forthcoming quite probably was unjustified. This makes it unnecessary to determine whether Simitar's evidence of industry custom and usage was credible and persuasive.

### 2. The Disputed Conversations

Each side has offered accounts of the two disputed conversations that, if credited, would be exceptionally helpful to it. If Lawlor, as she testified, told Darrow on January 8 that no negotiated licenses would be granted, Simitar's estoppel defense would fail because it knew that it could go forward with its album without infringing plaintiffs' copyrights only by filing timely notices for compulsory licenses and dropping any themes not subject to such licenses before distributing its album. On the other hand, if she simply backed off in response to Darrow's comments, much would turn on whether Connelly, in the December 15 conversation, gave Mahlum reason to believe that negotiated licenses would be issued. As the dispute over the January 8 conversation, if resolved in plaintiffs' favor, would be dispositive, the Court begins there.

The strongest argument in support of the accuracy of Darrow's account is the obvious fact that Simitar did not file notices for compulsory licenses following the January 8 conversation. Darrow is knowledgeable in copyright matters. If he had been told *by the copyright owner* that no negotiated licenses would be forthcoming, the failure to file for compulsory licenses before distributing the Simitar album would have been so outrageously negligent as to be almost unthinkable. Moreover, although Simitar has not made the point, the Court notes also that careful reflection by Lawlor—once she determined that Darrow could make good on his threat to obtain compulsory licenses provided he acted in time—should have resulted in the

---

**60.** *Id.* at 43. *See also Famous Music Corp. v. Seeco Records, Inc.,* 201 F.Supp. 560 (S.D.N.Y.1961) (industry custom and usage did not justify payment of royalties on the basis of records sold rather than records manufactured as required by statute); *Southern Music Pub. Co. v. Seeco Records, Inc.,* 200 F.Supp. 704 (S.D.N.Y.1960) (same).

**61.** *E.g., Hansen v. Harris,* 619 F.2d 942, 949 (2d Cir.1980), *rev'd on other grounds,* 450 U.S. 785, 101 S.Ct. 1468, 67 L.Ed.2d 685 (1981); *Hosp. Ass'n of N.Y. State, Inc. v. Toia,* 577 F.2d 790, 797 (2d Cir.1978); *Chambless v. Masters, Mates & Pilots Pension Plan,* 571 F.Supp. 1430, 1452 (S.D.N.Y.1983); *Twentieth Century–Fox Film Corp. v. Nat'l Pub., Inc.,* 294 F.Supp. 10, 12 (S.D.N.Y.1968); *In re Dombroff,* 192 B.R. 615, 622 (S.D.N.Y.1996); *Southern Fed. Sav. & Loan Ass'n of Ga. v. 21–26 E. 105th St. Assoc.,* 145 B.R. 375, 386 (S.D.N.Y.1991); *In re IMFC Financial Corp.,* 11 B.R. 874, 876 (Bankr.S.D.N.Y.1981); *Nassau Trust Co. v. Montrose Concrete Prod. Corp.,* 56 N.Y.2d 175, 184, 451 N.Y.S.2d 663, 667, 436 N.E.2d 1265 (1982); *Besicorp Group Inc. v. Enowitz,* 235 A.D.2d 761, 652 N.Y.S.2d 366, 369 (3d Dept.1997).

conclusion that warning Darrow of the importance of strict compliance with the formal requirements for compulsory licenses was against Titan's interests. Better to let him stumble and thus destroy any possibility of obtaining compulsory licenses.

On the other hand, there is much to support Lawlor's account as well. Lawlor testified that she went to her supervisor, Edward L. Kaufman, Titan's senior vice president and general counsel, immediately following her conversations with Darrow and recounted her discussions.[62] Kaufman has confirmed that Lawlor did so and the details of her contemporaneous account, including her statement that no negotiated licenses would be issued, Darrow's threat to obtain compulsory licenses, and her warning that "Simitar had better fully comply" with the compulsory license requirements.[63] Moreover, Kaufman, who was unfamiliar with compulsory licenses, promptly telephoned Titan's New York outside counsel to inquire about the availability of compulsory licenses to a competitor that had expressed an intention to put out an album competitive with *WWF—The Music,* and this is confirmed by the outside lawyer.[64]

Having carefully considered the corroboration for both accounts, the obvious self interest of every witness, the handful of relatively minor discrepancies in the accounts of both sides, and—most significantly—the demeanor of the witnesses and the tone of their testimony, the Court finds, for purposes of the preliminary injunction motion,[65] that Lawlor's account is accurate and that Darrow's is not. The Court's assessment is that Lawlor had something of a chip on her shoulder when she and Darrow first spoke. Darrow did not take kindly to it and was offended at the suggestion that Simitar had bootlegged or rerecorded plaintiffs' album. His dis-

pleasure was clear. Lawlor, on the other hand, was taken aback at the statement that Titan's partner, Cherry Lane, was in negotiations with Simitar to license a Simitar to compete with Titan. Her irritation was compounded when she learned from Cherry Lane, after her first conversation with Darrow, that there were no such negotiations, and she was somewhat belligerent in her second call with Darrow. She took satisfaction in telling Darrow, in substance, that he had not told her the truth about negotiations with Cherry Lane and in telling him that there would be no negotiated licenses. As Lawlor testified, Darrow was "cocky" and responded that Simitar would "just get a compulsory license." Lawlor, who resented Darrow's attitude, did not stop to think and simply blurted out that Simitar had better follow the law "to a tee" or it would be foreclosed from getting a compulsory license. Darrow, who regards himself as a copyright and entertainment law expert,[66] did not appreciate being lectured on compulsory licenses by a young paralegal and responded that he knew the law. This was even more provocative to Lawlor, who retorted that Titan would "own" Simitar if it did not follow the law. The conversation then ended.

Why, then, did Darrow not ensure that Simitar crossed the T's and dotted the I's to obtain compulsory licenses after having been warned by Titan? The answer is not entirely clear on this record, but there is a probable explanation. Although Titan was listed as the copyright owner in the album liner for plaintiffs' album, Simitar, as Mahlum testified, was operating on the assumption that the copyrights were owned by Cherry Lane. Indeed, Simitar's album liner incorrectly credits Cherry Lane alone

---

**62.** Tr. 93.

**63.** Kaufman Reply Decl. ¶¶ 3–5.

**64.** *Id.* ¶ 5; Grier Decl.

**65.** As on any preliminary injunction motion, the Court's findings of fact are preliminary in nature, subject to review upon plenary trial.

**66.** *See* Darrow Decl. ¶ 1.

as the owner of the copyright on thirteen of its fifteen cuts.[67] Darrow confirmed that he too was under the impression that Cherry Lane had the sole right to issue or decline to issue licenses.[68] In all probability, therefore, Darrow ignored Titan's warning because he assumed—unjustifiably and incorrectly—that Titan had no right, and could not influence Cherry Lane, to withhold negotiated licenses from a putative competitor.[69] Nor is this the only possibility.[70]

\*     \*     \*     \*     \*     \*

■ Plaintiffs' *prima facie* case of copyright infringement is undisputed. Given the Court's finding that Lawlor told Simitar on January 8 that it would not receive negotiated licenses, any reliance on industry usage, prior dealings between the parties, or anything that may have been said on December 15[71] was not justified from that moment on. Simitar still had plenty of time to obtain compulsory licenses. Accordingly, at least at this preliminary injunction stage, there is no merit to Simitar's estoppel/unclean hands defense. Plaintiffs' therefore are likely to prevail on the merits.

### C. The Remedy

As plaintiffs have demonstrated a threat of irreparable injury and a strong likelihood of success on the merits, it is unnecessary to balance the equities; a prohibitory injunction is appropriate. Satisfaction of that high threshold of probable success, moreover, permits the issuance of a mandatory injunction. It therefore remains to consider whether such an order is appropriate in all the circumstances.

■ In *Perfect Fit Industries, Inc. v. Acme Quilting Co.,*[72] the Court of Appeals indicated that the defendant's good faith or bad faith, the likelihood of diversion of customers from plaintiff to defendant, the extent of the burden entailed in a recall including the breadth of distribution and the shipping costs, and the probability that the plaintiff would benefit from such an order all are appropriately considered in determining whether to order a recall.[73] And while *Perfect Fit* involved a permanent rather than a preliminary injunction, recall orders have been issued at the preliminary injunction stage, although the question whether the district court has held an evidentiary hearing as opposed to deciding the matter on affidavits and the likelihood that fuller development of the facts might alter its view are quite relevant.[74] The fact that this Court has held

---

67. Ferber Decl. Ex. A.

68. Tr. 51.

69. He appears, in the heat of the moment, to have overlooked the fact that Lawlor told him that there would be no negotiated licenses after she first had spoken to Cherry Lane, a fact that perhaps should led him to take her statement more seriously.

It should be noted also that Darrow's evident assumption concerning Titan's lack of any role with respect to licensing the music on plaintiffs' album would have been unjustified even if Connelly on December 15 had indicated that Cherry Lane was in a position to license most of the music on Mahlum's list. Its ability to license that music, assuming that it had the legal right to do so without Titan's consent, would not have justified Simitar in assuming that Cherry Lane would pay no attention to any views expressed by Titan.

70. The conversation between Darrow and Lawlor took place only eleven days before Simitar shipped its album. Simitar may have

concluded that prompt shipment would make a prospective injunction (i.e., a restraint on future sales) ineffective, that a recall order would be unlikely, and that its real downside risk would be the payment of damages equal to the statutory royalty rate. If it so concluded, the failure to file notices for compulsory licenses, while certainly sloppy, would have been entirely understandable.

71. In any case, the Court finds that Connelly said nothing to Mahlum that reasonably could be construed as indicating that negotiated licenses would be granted. Indeed, Mahlum's subsequent faxes to Connelly conspicuously fail to refer to any such statement.

72. 646 F.2d 800 (2d Cir.1981).

73. *Id.* at 807.

74. *Gund, Inc. v. Golden Bear Co.,* No. 92 Civ. 8555(LJF), 1992 WL 392602 (1992), 1992 WL 392602, at \*5 (S.D.N.Y.1992); *Hukafit Sports-*

an evidentiary hearing in which it heard from both participants in the pivotal conversation and can imagine little other evidence that could be presented on that point makes a recall order more appropriate than otherwise would be the case, all other factors being equal.[75]

In this case, Simitar argues against a recall order principally by contended that a recall would cost it as much as $10 million and threaten its viability, thus making such an order unduly burdensome. Simitar's chief executive officer, Mickey Elfenbein, came to the $10 million figure by adding $3.5 million for sales already made, $3.5 million for loss of future sales, $1 million for the immediate cost of the recall including shipping, packing, and advertising that already has been committed, and potential liability to customers of $2 million for the profits the customers would have earned absent a recall.

Simitar gave no support for any of Elfenbein's claims, and the figures obviously are inflated. To give one clear example, Simitar has manufactured a total of 350,000 copies of *Slammin' Wrestling Hits*. Thus, Elfenbein attributed $7 million in sales to 350,000 copies, or $20 per copy. But Simitar quite clearly is not getting anything approaching $20 per copy.[76]

While the Court does not believe that the extent of the harm that would follow from a recall order remotely approaches what Simitar claims, there is no doubt that a recall would cause Simitar some loss of credibility in the marketplace and, to the extent that it is effective, cost money. Simitar would have to refund the wholesale price of units returned pursuant to the recall order and pay shipping expenses and take a loss to the extent of the manufacturing and production costs. It might have to pay for any advertising arrangements already made that cannot now be cancelled without penalty, although there is no way to determine whether those costs, if any, would be material. Thus, there would be some hardship to Simitar if it wrongfully were ordered to recall the product. But there are countervailing considerations.

First, Simitar deliberately sailed in harm's way. It knew on January 8 that Titan would do whatever it could do to stop *Slammin' Wrestling Hits* but went ahead anyway. Even disregarding the January 8 conversation, Simitar continued manufacturing and shipping after it received a cease and desist letter from plaintiffs on or shortly after February 8.[77] Indeed, Simitar did not even stop when plaintiff moved for a preliminary injunction on February 24. Rather than seek a prompt ruling, it sought to delay consideration of the motion while it admittedly manufactured 75,000 units and shipped 50,000 to 75,000 between that date of the motion and the hearing on March 5. Hence, Simitar made and shipped much of the unsold inventory now in the hands of distributors and retailers after it knew that it was proceeding without a valid license in the face of plaintiffs' objections and with a court order possibly imminent. There is every reason to believe that it sought to get the product into the hands of distributors and retailers as quickly as possible to set up precisely the argument it now makes. In any case, the hardship of which it complains was significantly of

---

wear, Inc. v. Banff Ltd., 228 U.S.P.Q. 249, 251–53 (S.D.N.Y.1985). *See also Carolina Ent. v. Coleco Industries, Inc.*, 211 U.S.P.Q. 479, 488 (D.N.J.1981); *Nik–Nik Industries v. Walt Disney Prod., Inc.*, 194 U .S.P.Q. 108 (S.D.N.Y.1976).

75. *Hukafit Sportswear, Inc.*, 228 U.S.P.Q. at 251–53.

76. The suggested *retail* price of the CDs, which account for about 83 percent of the units, is $14.98 while that of the records, the balance of the units, is $9.98. (Mahlum Decl. Ex. C, at 2) (prices); Darrow Decl. Ex. F (CD-album breakdown). A more realistic figure for the total revenue that might be expected from the sale of all 350,000 units probably is far less than $7 million.

77. Connelly Decl. ¶ 10 & Ex. C.

its own making and could have been avoided or limited if it had stopped shipping when Simitar received plaintiffs' first cease and desist letter. While the Court recognizes that proceeding in the face of a cease and desist demand is not inherently inconsistent with good faith because some such demands are not well grounded,[78] Simitar's actions after it was informed of plaintiffs' objections seriously undermine its position.[79] It knew that plaintiffs had valid copyrights and that it had no license. At best it had a debatable estoppel argument. It bet on the possibility that it could settle with plaintiffs or prevail in litigation "and should not escape the consequences of its conduct" simply because it made a losing bet.[80]

Second, there is little evidence that Simitar, once it indisputably was placed on notice of plaintiffs' position on February 8, made any serious effort to determine whether its legal position was meritorious. To the extent it relied on its house counsel, Darrow, it relied upon an individual who was directly involved in the pivotal and disputed events and who manifestly had a personal interest in giving advice based on the premise that his account of the disputed conversation with Lawlor was accurate. There is no evidence that it sought independent legal advice from an attorney free to consider the implications for Simitar of any inaccuracy in Darrow's claim that Lawlor had withdrawn her objection to Simitar's project in the January 8 conversation.

Finally, the denial of a recall order would deprive plaintiffs of any effective relief. As Simitar has shipped substantially all of the offending product, a prohibitory injunction alone, which would be binding only on Simitar,[81] would not stop sales of the allegedly infringing album. A recall, on the other hand, probably would remove a substantial quantity of the infringing merchandise from the market. Thus, substantial benefit to plaintiffs must be balanced against hardship to Simitar.

Simitar argues also, somewhat inconsistently, that the Court should deny a recall order because it would be ineffective. It argues that it reaches retail consumers and, in many cases, retail record sellers only through intermediaries which it does not control, thus making it impossible to ensure that all offending product would be recaptured.

Certainly Simitar's distribution arrangements are complex. It has a total of 800 to 1,000 customers in three channels: (1) rack jobbers, distributors and one-stops, (2) music retailers, and (3) individual so-called "Mom and Pop" music stores. The rack jobbers, distributors and one-stops sell to other distributors, some of which sell to still other distributors, with the product eventually moving to individual retailers. The music retailers in the second category are chiefly large store chains, and Simitar ships product either to their distribution centers or directly to each of their stores. There is a large number of "Mom and Pop" stores, but they buy relatively little product.[82]

---

78. *See, e.g., Estee Lauder, Inc. v. The Gap, Inc.,* 932 F.Supp. 595, 615–16 (S.D.N.Y.1996), *rev'd on other grounds,* 108 F.3d 1503 (2d Cir.1997).

79. *See Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger, U.S.A., Inc.,* 80 F.3d 749, 754 (2d Cir.1996) (continuation of sales after cease and desist letter and confirmation of existence of plaintiff's trademark evidence of bad faith).

80. *Id.*

81. Of course, the injunction would bind as well those listed in Rule 65 in addition to all persons in active concert and participation with Simitar who receive actual notice of the order. As it is at least debatable whether a retailer or distributor with which Simitar has no direct contractual relationship would be in actual concert and participation with it, the Court assumes that the injunction as a practical matter would bind only Simitar. That is *not to say, however, that an injunction might* not be found, in appropriate circumstances, to bind others as well.

82. Tr. 99–101.

This structure probably does mean that no recall order effectively could reach all of the product that remains unsold. But that is no reason not to make a reasonable effort to recapture as much volume as is possibly through appropriate effort. And it is not difficult to formulate such an effort.

There are only ten customers in the rack jobber-distributor-one-stop category, and they account for the largest part of Simitar's sales volume. While it might well be unreasonable and even futile to seek to require those customers to trace product through subdistributors to retail stores, it is not unreasonable to seek to recall whatever is in their hands and to ask—not insist—that they attempt to recall product from their customers.

The music retailer category accounts for the second largest portion of Simitar's volume and is a simpler matter. Whether Simitar ships to retail distribution centers for a given chain or drop ships to a chain's individual stores, the music retailers all are direct customers of Simitar from whom product readily can be recalled. The same is true for the "Mom and Pop" stores, although there are many more of them.

Taking all of these considerations into account, the Court has concluded that a recall order is appropriate, although the terms of the order have been tailored to impose no greater burden on Simitar than is reasonable in all the circumstances. While this will not succeed in removing all infringing copies from the market, the Court finds that the likely extent of its success in doing so will be beneficial to plaintiffs to a degree significantly outweighing the burden of the effort on Simitar.

### D. The Bond

Rule 65(c) provides that preliminary injunctions ordinarily should be issued only upon the giving of a bond or other security. In this case, there is very little reason to require security for so much of the injunction as enjoins future sales of the infringing album, as Simitar by its own admission has shipped nearly all its inventory, although there is some risk of the loss of unspecified advertising expenses. The recall order, on the other hand, is another matter. Unfortunately, however, Simitar's claims at the hearing of potential injury from a recall order were inflated and provided no real basis for fixing the amount of security to be required. Accordingly, the Court has conditioned the portion of the injunction requiring a recall on plaintiffs posting a bond in the amount of $250,000 while lesser security has been fixed for the other portion of the injunction, in each case without prejudice to a prompt application by either side to adjust the amounts upon a further evidentiary showing.

### IV. Conclusion

The foregoing sets forth the Court's findings of fact and conclusions of law. On March 8, 1999, the Court granted plaintiffs' motion for a preliminary injunction and entered the following order:

1. Simitar, its officers, agents, servants, employees, and attorneys and all persons in active concert or participation with any of them who receive actual notice of this order by personal service or otherwise be and they hereby are enjoined and restrained, pending the hearing and determination of this action, from (a) manufacturing, selling, or distributing the phonorecord entitled *Slammin' Wrestling Hits* (the "Album") in any recorded format, and (b) advertising, promoting, or contributing to the cost of advertising or promoting the Album, *provided, however,* that nothing herein shall prevent payment of advertising and promotional expenses which the payor is legally and irrevocably obliged to pay at the time this order is issued. For purposes of this order, the word "phonorecord" shall have the meaning ascribed to it in Section 101 of the Copyright Act of 1976, 17 U.S.C. § 101.

2. Within seven (7) days from the date of the order, Simitar shall send to each

326

customer to whom it has sold or distributed the Album a letter advising the addressee that the Album has been recalled pursuant to the order of this Court, requesting the addressee immediately to cease the sale or distribution of the Album and to return all copies of the Album in its possession, custody or control to Simitar, and offering to reimburse the addressee for the reasonable costs incurred in doing so. The form of letter sent to rack jobbers, distributors and one-stops shall request that the addressee to recall copies of the Album sold or distributed by it to its direct customers and return all copies to Simitar and offer to pay their reasonable costs incurred in doing so. The form of the letter(s) shall be approved in writing by counsel for the plaintiffs or, if such approval is not obtained, by the Court. The form of any letters submitted to the Court for approval shall be filed no later than 4 p.m. on March 11, 1999.

3. Paragraph 1 of this order is effective immediately, but its continued effectiveness beyond 5 p.m. on March 11, 1998 is conditioned upon plaintiffs first having posted a bond in the amount of $25,000 for the payment of such costs and damages as Simitar may incur if it is determined that it was wrongfully enjoined as set forth in paragraph 1.

4. The obligation to send the letter(s) required by paragraph 2 of this order is conditioned upon plaintiffs first having posted a bond (in addition to the bond required by paragraph 3 of this order) in the amount of $250,000 for the payment of such costs and damages as Simitar may incur if it is determined that it was wrongfully enjoined as set forth in paragraph 2.

SO ORDERED.