Jason B. NICHOLAS, Plaintiff,

v.

Thomas J. MILLER, Robert Hanslmaier, and New York State Department of Correctional Services, Defendants.

No. 96 Civ. 4249(WK).

United States District Court,
S.D. New York.

July 21, 2000.

Martin L. Zerwitz, Schulte Roth & Zabel LLP, New York, NY, Jason B. Nicholas, Warwick, NY, for Plaintiff.

Nicola N. Grey, Office of the Attorney General, State of New York, New York, NY, for Defendant.

## OPINION & ORDER

WHITMAN KNAPP, Senior District Judge.

### BACKGROUND

We assume familiarity with the background information set forth in the prior decisions in this matter of this Court and the Court of Appeals. *See Nicholas v. Miller* (2d Cir.1999) 189 F.3d 191.

Plaintiff Jason Nicholas (hereinafter "plaintiff") sued defendant New York State Department of Corrections (hereinafter "defendant" or "DOCS") to establish an authorized Prisoners' Legal Defense Center (hereinafter the "Center") where he is incarcerated.[1] We granted summary

judgment to defendant and denied plaintiff's motion for injunctive relief as moot. The Second Circuit remanded, ruling that the evidentiary record as of June 1999 contained material disputes of fact. *Id.* at 195. Defendant in its appearances before us has done nothing to put that finding in doubt. We therefore deny its motion for summary judgment.

Turning to plaintiff's motion for a preliminary injunction, we have held a two-day hearing, including the testimony of several witnesses. We have also considered affidavits and memoranda of law. For the reasons stated below, we deny plaintiff's motion, for which this opinion and order will constitute our findings of fact and conclusions of law.

Plaintiff's proposed Center would engage in three kinds of activities: First, as a group and using organizational stationery, it would disseminate information to the public and the media regarding legal issues of importance to prisoners. For example, the Center possibly would publish a newsletter reviewing such issues and addressing prison policy. It would, in appropriate cases, lobby for prison reform.

Additionally, the Center would engage in "impact litigation," i.e., prosecute select prisoner lawsuits of relatively wide significance. Finally, it would educate the local inmate population, allowing prisoners to assemble, discuss their views, and attempt to arrive at a consensus. It would invite speakers, hold paralegal training classes, and perhaps publish handbooks and pamphlets. Incidentally, the organization would raise money and would thus, according to plaintiff, need no other financial assistance.

DOCS proffers two justifications for rejecting the Center. First, DOCS argues that the Center will duplicate existing ser-

---

1. In his original complaint, plaintiff requested permission to open a legal center at the Woodbourne Correctional Facility. DOCS has since relocated plaintiff to the Mid–Orange Correctional Facility. He now asks to open a center only where he is currently

imprisoned, and we have heard evidence specifically relating to this context. The complaint has been dismissed against defendants Thomas J. Miller and Robert Hanslmaier on grounds of qualified immunity.

vices. DOCS currently permits plaintiff and the other inmates individually to contact the media and the government, and to research the law and file suits with the assistance of the law library staff. But, since DOCS refuses to approve the Center as an authorized organization, plaintiff cannot now associate with other inmates to engage in these activities on a *group* basis, which entails a distinct kind of expression.[2] We therefore shall not consider this DOCS argument for present purposes.

Second, DOCS argues that the Center might generate a significant security risk. It asserts that since the Center will engage in activities of an adversarial nature, particularly belligerent prisoners may use the Center as a way to incite violence, anti-authoritarian behavior, or extortion. We shall consider the merits of this contention.

### DISCUSSION

A preliminary injunction constitutes an extraordinary remedy which should not be routinely granted. *Pride v. Community Sch. Bd.* (2d Cir.1973) 482 F.2d 257, 264. Someone seeking a preliminary injunction normally must demonstrate (1) a material threat of irreparable injury and (2) either a likelihood of success on the merits or (2) the existence of serious questions going to the merits as to make the case a fair ground for litigation and that the balance of hardships tips decidedly in favor of the movant. *See, e.g., Cherry River Music Co. v. Simitar Entertainment, Inc.*, 38 F.Supp.2d 310 (S.D.N.Y.1999) (citations omitted).

Were plaintiff's request for an injunction to sustain the status quo, we would begin by assuming a material threat of irreparable harm, *see Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) ("[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury"),

since the Second Circuit has ruled that plaintiff's claimed violation of his associational rights has "an arguable basis in law." *Nicholas,* 189 F.3d at 193. Moreover, our present ruling denying defendant's summary judgment motion establishes the existence of serious questions going to the merits.

■ However, we apply a higher standard in cases, such as the instant one, where the injunction would alter the status quo. Such a "mandatory" injunction should issue "only upon a clear showing that the moving party is entitled to the relief requested" in the complaint, or "where extreme or very serious damage will result from a denial of preliminary relief." *Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc.* (2d Cir.1995) 60 F.3d 27, 34 (citations · omitted); *see also, e.g., Cherry River Music Co.,* 38 F.Supp.2d at 316 & n. 46.

### I. CLEAR SHOWING OF ENTITLEMENT TO RELIEF REQUESTED

Plaintiff correctly notes that on this motion, defendant has the burden of *production* – i.e., to advance rationales for denying the Center that bear a reasonable relationship to a legitimate penological interest. Yet the burden of *proof* remains on plaintiff to show that the regulation is clearly unreasonable. *Giano v. Senkowski* (2d Cir.1995) 54 F.3d 1050, 1054 (citations omitted). Plaintiff has not met his burden here.

### A. Standard of Review for Prisoner First Amendment Cases

■ The Supreme Court has declared that, "When a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254,

---

**2.** No matter what plaintiff or the other inmates can write or research in isolation, if they cannot gather to discuss common issues (or invite guest speakers, communicate as a group, or conduct other activities permitted only to approved inmate organizations), the public power of their unique collective voice may appreciably diminish.

96 L.Ed.2d 64 (1987). The *Turner* Court set forth a four-part test to determine the reasonableness of such regulations:

First, there must be a "valid, rational connection" between the prison regulation and the legitimate governmental interest put forward to justify it.... Moreover, the governmental objective must be a legitimate and neutral one....

A second factor ... is whether there are alternative means of exercising the right that remain open to prison inmates....

A third consideration is the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally....

Finally, the absence of ready alternatives is evidence of the reasonableness of a prison regulation.

*Id.* at 89–90, 107 S.Ct. 2254 (citations omitted).

■ We must apply a deferential standard of review to challenges to prison regulations because "courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform." *Id.* at 84, 107 S.Ct. 2254.

[T]he problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree. Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches ... Where a state penal system is involved, federal courts have ... additional reason to accord deference to the appropriate prison authorities.

*Id.* at 84–85, 107 S.Ct. 2254 (citations omitted).

On the other hand, the Supreme Court did not intend *Turner*'s reasonableness analysis to be "toothless." *Thornburgh v. Abbott*, 490 U.S. 401, 414, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989). We should not adopt prison officials' rationales unthinkingly, especially since these officials have every incentive to "err on the side of too little freedom." *Jones v. North Carolina Prisoners' Labor Union, Inc.* (1977) 433 U.S. 119, 142, 97 S.Ct. 2532, 53 L.Ed.2d 629 (Marshall, J., dissenting).

### B. Is the First Amendment Implicated?

As the Court of Appeals intimated, plaintiff has by no means established that there clearly exists an associational right under the First Amendment for prisoners to organize for the adversarial functions that plaintiff demands. *See Nicholas,* 189 F.3d at 195. The *Turner* Court *"refined* the standard of review for *all* prison regulations that *impinge* on inmates' constitutional rights." *Id.* at 194 (our emphasis). Yet "implicit in the *Turner* approach is the principle that [its] four-factor analysis applies only after it is determined that the policy impinges on a first amendment right." *Ali v. Dixon* (4th Cir.1990) 912 F.2d 86, 89; *see Turner,* 482 U.S. at 95–100, 107 S.Ct. 2254 (deciding as a threshold matter whether the right to marry, certainly protected by the Constitution for free citizens, attaches in the prison context, i.e., whether marriage is consistent with an inmate's "status as a prisoner or with the legitimate penological objectives of the corrections system") (citation omitted).

■ In making its initial inquiry, the *Turner* Court – and the Second Circuit in the case at bar and elsewhere – continue to find guidance from an earlier precedent stating that a prisoner's associational rights are perforce significantly curtailed by his or her "status as a prisoner" and the "operational realities of a prison." *Jones,* 433 U.S. at 125–26, 97 S.Ct. 2532, cited in *Turner,* 482 U.S. at 86–89, 90, 92, 107 S.Ct. 2254; *Nicholas,* 189 F.3d at 194; *Giano,* 54 F.3d at 1052–53; *Allen v. Coughlin* (2d Cir.1995) 64 F.3d 77, 79.

One Third Circuit opinion did order a preliminary injunction against the disbanding of a prisoner organization called the Inmate Legal Association ("ILA") that provided high quality paralegal assistance. *Valentine v. Beyer* (3d Cir.1988) 850 F.2d 951. The *Valentine* Court noted that the ILA afforded prisoners legal education classes and a forum for private discussions and for "networking" about inmate cases. *Id.* at 955–56. The Court considered these arguably "associative" factors as elements of individuals' effective access to the courts. *See id.*[3] Yet the Second Circuit in the instant case has ruled that, "The considerable body of caselaw that has provided definition to the [right to provide legal assistance to other inmates] is not directly implicated in this case, as we earlier dismissed [plaintiff's] right of access claim as frivolous." *Nicholas*, 189 F.3d at 195; *see generally Murphy v. Shaw* (9th Cir.1999) 195 F.3d 1121, 1126 & n. 6, *petition for cert. filed*, No. 99–1613, 68 U.S.L.W. 3657 (U.S. Apr. 6, 2000) (noting that only some circuits have recognized an associational right of an inmate to give legal aid to a fellow prisoner).

Independently of that specific right, some courts, relying on a Supreme Court decision outside the prison context, have held that a prisoner's associational rights may be implicated when he pursues socially meaningful class action or civil rights litigation (as a form of "political association"). *See, e.g., Smith v. Maschner* (10th Cir.1990) 899 F.2d 940, 950 (quoting an Eleventh Circuit case that relies on *NAACP v. Button*, 371 U.S. 415, 419, 431, 83 S.Ct. 328, 9 L.Ed.2d 405, (1963)); *cf. Rizzo v. Dawson* (9th Cir.1985) 778 F.2d 527, 531–32 (citing *Button* and its progeny). This circuit has not acknowledged such a right. Moreover, these cases grant protection to individual inmates commencing impact litigation. When a group of several inmates assembles to achieve this goal, however, it is precisely the group setting that seems most inconsistent with the inmates' "status as prisoner[s]."

Nevertheless, at this stage of the proceedings, we do not decide plaintiff's motion on this issue, but instead proceed to examine the particular facts in light of the four enumerated *Turner* factors.

### C. "Rational Connection"

■ *Turner's* first factor demands that we inquire whether a rational connection exists between the challenged governmental policy and a legitimate interest. *Turner*, 482 U.S. at 89, 107 S.Ct. 2254. This requires us to determine whether the governmental objective underlying the policy is (1) "legitimate" and (2) "neutral," and (3) whether the policy is "rationally related" to that objective. *Thornburgh*, 490 U.S. at 414, 109 S.Ct. 1874.

As above noted, we have recognized that we must consider defendant's concern with security. This is surely a "legitimate" consideration. *See id.* at 415, 109 S.Ct. 1874. Moreover, this case also meets the requirement that the policy be "neutral." As the Supreme Court explained in *Thornburgh*, to meet the "neutrality" test,

> the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression. Where, as here, prison administrators draw distinctions between publications solely on the basis of their potential implications for prison security, the regulations are "neutral" in the technical sense in which we meant and used that term in *Turner*.

490 U.S. at 415–16, 109 S.Ct. 1874 (quotations and citation omitted).

Here, analogous to *Thornburgh*, the prison administrators differentiated among

---

3. *Valentine* is also distinguishable from the present case for two reasons. First, the injunction there essentially upheld rather than transformed the status quo. Second, the trial court there "carefully analyzed security considerations" and concluded that the importance of inmates' meaningful access to the courts outweighed any potential security threat presented by the continued functioning of the ILA. *Id.* at 953–54, 957–58.

inmate organizations based solely upon such groups' potential effects on the prison's security and order. Plaintiff claims that defendant suppressed his proposed Center because the Center would have raised a united voice in opposition to prison policy and practice. Yet, as discussed below, defendant has marshaled significant evidence of security risks not related to the specific politics of the Center's putative members. DOCS does allow individual prisoners to write letters of protest, to file grievances against it, and to complain through liaison committees. But, when a prison organization causes rational security concerns related to its anti-authoritarian nature, we find that DOCS may appropriately deny approval.

Finally, the government has adequately shown that its denial of plaintiff's Center is rationally related to its legitimate objectives. To show such a relationship between a regulation and an interest, "prison officials need not prove that the banned [organization] actually caused problems in the past, or that [it is] likely to cause problems in the future" (although evidence of past problems will bolster the government's case). "Moreover, it does not matter whether we agree with the [defendant] or whether the policy in fact advances the [prison's] legitimate interests. The only question that we must answer is whether the [defendant's] judgment was rational, that is, whether the [defendant] might reasonably have thought that the policy would advance its interests." *Mauro v. Arpaio*, 188 F.3d 1054, 1060 & n. 3 (9th Cir.1999) (en banc), *cert. denied,—* U.S. ——, 120 S.Ct. 1419, 146 L.Ed.2d 311 (2000) (citations and internal quotation marks omitted). That is, the relationship between the policy and the goal must not prove "so remote as to render the policy arbitrary or irrational." *Turner*, 482 U.S. at 89–90, 107 S.Ct. 2254.

Our deference to experts may properly lead us to "conclude that certain proposed interactions, though seemingly innocuous to laymen, have potentially significant implications for the order and security of the prison." *Thornburgh*, 490 U.S. at 407, 109 S.Ct. 1874. In this regard, the instant case parallels *Jones*. There, prison officials uniformly testified that the concept of a prisoners' labor union "was itself fraught with potential dangers," even if the originators of the concept harbored the best intentions. 433 U.S. at 126, 97 S.Ct. 2532; *see also id.* at 127–29, 131–33, 97 S.Ct. 2532. Experienced government witnesses here, as in *Jones,* consistently declare that the more adversarial the purpose and methods of an inmate group, the higher the risk that a vocal minority within the group may recast it as a vehicle for consolidation of power and influence among the inmate population. Individuals may then find themselves coerced into joining the group and participating in disruptive schemes. One might also rationally predict friction between members and nonmembers. *See also, e.g., Duamutef v. O'Keefe* (2d Cir.1996) 98 F.3d 22, 24 (speech and associational rights involved in preparing and circulating petitions in prison outweighed by safety concerns).

Plaintiff attacks these security concerns along three main lines. None of these arguments sufficiently demonstrates defendant's alleged irrationality. First, plaintiff suggests that group meetings criticizing the government actually serve as a "safety valve," allowing otherwise angry and violent people to vent their frustrations productively. We find this argument plausible, especially since inmate riots used to occur before prisons began routinely to condone some prisoner organizations. Still, so far, we have heard this theory advanced only by plaintiff himself and by a supervising attorney for the Prisoners' Rights Project of The Legal Aid Society. Without any expert opinion regarding such group catharsis, we credit the informed judgment of DOCS personnel, who note that groups typically present a far greater risk than individuals: In the volatile context of a correctional facility, group unrest can escalate without warning.

A few enraged men can turn an otherwise positive forum into a riot.

Plaintiff's second main argument posits that DOCS already closely monitors and controls approved inmate organizations, and that such supervision forestalls most potential threats. Granted, DOCS maintains intelligence-gathering and special tactics forces that monitor unruly individuals and groups. Moreover, DOCS regulations restrict approved organizations in several ways. For example, (1) the regulations set a cap on the number of members joining a given group; (2) DOCS assigns each group a staff supervisor; (3) DOCS must pre-clear any correspondence, invited speakers, and newsletters; and (4) prison officials may remove a given inmate from any group for improper behavior.

Yet, defendant's witnesses assert that their surveillance capacity has limits. For instance, they do not have sufficient staff to watch over every inmate meeting, much less to oversee whether a malicious group leader might secretly coerce others once the meeting ends. If DOCS miscalculates, lives and significant resources may be sacrificed. Defendant rationally chooses not to gamble with such high stakes, which is why it disapproves of plaintiff's Center at the onset. *Cf. Jones*, 433 U.S. at 132–33, 97 S.Ct. 2532 ("Responsible prison officials must be permitted to ... act before the time when they can compile a dossier on the eve of a riot.").

Finally, plaintiff affirms that other prisons across the country and in New York have authorized the existence of allegedly "adversarial" prison organizations with similar goals to his, with no harmful consequences. If correct, this evidence would tend to demonstrate, notwithstanding the above testimony and analysis, that defendant's rejection of the Center represents an "exaggerated response." *See Turner*, 482 U.S. at 90, 107 S.Ct. 2254. On the other hand, the Constitution "does not mandate a 'lowest common denominator' security standard, whereby a practice permitted at one penal institution must be permitted at all institutions." *Id.* at 93, 107 S.Ct. 2254 n.* (quoting *Bell v. Wolfish*, 441 U.S. 520, 554, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)).

The current record in the instant case indicates that at least three pre-existing groups seem similar to the proposed Center.[4] At this stage, though, plaintiff has not met his burden of proof. We do not yet have enough information about the aspirations, membership, and actual practice of these other groups to conclude whether or not they are riskier than plaintiff's Center. Further, we do not know what security arrangements have been made to minimize hazards in the other groups, and whether such arrangements would be feasible at Mid–Orange. A court may properly decide that a movant has not demonstrated a reasonable likelihood of success if, after reviewing the evidence, it appears that there remains a substantial dispute as to the material facts. *Cf., e.g., Marcy Playground, Inc. v. Capitol Records, Inc.* (S.D.N.Y.1998) 6 F.Supp.2d 277, 283 n. 21 (citation omitted).

The Second Circuit has directed that we consider whether "some of the proposed Center's functions but not others would survive *Turner* analysis," *Nicholas*, 189 F.3d at 195, and we conclude that none of the functions are clearly likely to survive such analysis. We credit the three defense witnesses who have testified in detail about the peril of approving any gatherings called together by an antagonistic organization. Implicit in defendant's posi-

---

4. First, Dale Artus, a government witness and the director of DOCS' Crisis Intervention Unit, testified about a "political action seminar" at New York's maximum-security Green Haven C.F. (Tr. 63). Second, an inmate group in Washington state publishes a newsletter. Third, as mentioned above, inmates at New Jersey's highest security state prison formed an Inmate Legal Association. *Valentine*, 850 F.2d at 953, 958. Plaintiff also alleges that similar programs exist at Auburn C.F., at Rahway State Prison, and at Lewisburg Federal Prison.

tion is that additional functions, such as publishing, lobbying, or inviting guest speakers, would heighten an already sufficiently unacceptable risk.[5]

### D. Alternative Avenues

The second *Turner* factor we must consider in determining the reasonableness of the policy's restriction on constitutional rights is "whether there are alternative means of exercising the right that remain open to prison inmates." *Turner*, 482 U.S. at 90, 107 S.Ct. 2254. In applying this factor, "the right in question must be viewed 'sensibly and expansively,' allowing for "flexibility" in determining what qualifies as another means of expression." *Giano*, 54 F.3d at 1055 (quoting *Thornburgh*, 490 U.S. at 417, 109 S.Ct. 1874; citing *Turner*, 482 U.S. at 78, 107 S.Ct. 2254). For example, in *Turner*, the Court upheld a regulation that restricted correspondence between inmates at different state prisons. In doing so, the Court rejected the argument that the government should afford inmates other means of communicating with inmates at other institutions, finding it sufficient if other means of expression remained available to the inmates. *See Turner*, 482 U.S. at 92, 107 S.Ct. 2254.

So long as the regulations foreclose only one of several ways in which inmates may exercise a specific first amendment right, the fact the prohibited activity may be a more desirable means of expression does not diminish the import of the remaining alternative.

*Giano*, 54 F.3d at 1055–56 (citation omitted).

Viewing the rights to assemble and to speak at issue here in this sensible and expansive manner, we hold that this factor is satisfied. Defendant sufficiently accommodates the free speech needs of individual prisoners by permitting them to write complaints addressed to the media and the government. (DOCS supplies inmates with directories of officials, writing materials, and stamps.) DOCS cannot and does not habitually suppress plaintiff's protests. Indeed, plaintiff is clearly an intelligent and eloquent spokesperson for prisoners' rights who has already initiated over thirty lawsuits on behalf of himself and others. Further, the government "has not hampered the ability of prison inmates to communicate their grievances to correctional officials," for "[t]here exists an inmate grievance procedure through which ... remedial action may be secured." *Jones*, 433 U.S. at 130 n. 6, 97 S.Ct. 2532; *see also Duamutef*, 98 F.3d at 24 ("effective" grievance system in New York state prisons). Finally, plaintiff may join the ILC and a

---

5. Still, because each side discussed the Center's paralegal function in depth, we comment about that function, concluding that it may present a serious menace. Granted, the record shows that DOCS already allows prisoners to help each other to prepare lawsuits. Even when an inmate is not affiliated with the prison library's law clerk program, DOCS routinely grants permission for such assistance on a case-by-case basis. Consequently, prisoners with legal expertise already exert power over those whom they help (or opt not to help), and thus the potential *already exists* for extortion, coercion, anger, incompetence, and discrimination.

However, defendant contends that the Center would potentially expose inmates and staff to unique risks. First and foremost, plaintiff apparently hopes that his Center will vote democratically to pursue a few important class action suits. Unfortunately, a vocal minority may become excessively interested in forcing the potentially considerable resources of the Center to be diverted towards one kind of lawsuit. When DOCS approves legal assistance on an *individual* basis, no such risk develops that entire sub-groups of the inmate population will fight for representation. Also, defendant argues that the law library supervises legal assistance via carefully established methods and specifically trained personnel in order to ensure that (1) confidential legal documents do not fall into the hands of third parties, who can use the information against the litigant; (2) inmates do not extort payments or favors from each other; and that (3) all segments of the population (including minorities) have equitable access to representation. Outside the structured environment of the law library program, and in a new and large group setting, these security-enhancing protections might well fall away.

host of other approved inmate organizations.

### E. Impact on Others

The third factor that we must address is the impact that accommodation of the asserted constitutional right would have on prison personnel, other inmates, and the allocation of prison resources. *Turner,* 482 U.S. at 90, 107 S.Ct. 2254. "When the accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials." *Id.* (citing *Jones,* 433 U.S. at 132–33, 97 S.Ct. 2532).

Given the risk of violence introduced by opening the Center, this factor is also met here. As the Second Circuit has stated,

> Increased violence among inmates has a direct adverse affect on the inmates involved, and a ripple effect ... Violent encounters among inmates drain prison resources ... Furthermore, any increase in the level of prison violence unnecessarily risks lighting a spark in an environment in which there is no dearth of short fuses.

*Giano,* 54 F.3d at 1056; *cf. Mauro,* 188 F.3d at 1061.

### F. Ready Alternatives

The fourth and final factor that we must deal with asks whether the policy constitutes an "exaggerated response" to the prison's concerns. As noted in *Turner,* 482 U.S. at 90–91, 107 S.Ct. 2254 (citations omitted):

> [T]he absence of ready alternatives is evidence of the reasonableness of a prison regulation. By the same token, the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable ... This is not a "least restrictive alternative" test: prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint. But if an in-

mate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard.

Plaintiff has made no such showing.

### II. EXTREME OR VERY SERIOUS HARM

Given that plaintiff has other means of voicing his dissent and congregating with fellow inmates, that he continues to prosecute lawsuits, and that a plenary trial of this case is forthcoming shortly, we see no extreme harm in maintaining the status quo.

### CONCLUSION

For the reasons indicated above, we DENY defendant's motion for summary judgment and DENY plaintiff's motion for a preliminary injunction.

Although we have found that plaintiff has not produced enough evidence or arguments to persuade us that DOCS' actions have not related rationally to a legitimate penological interest, we remind the parties that plaintiff may develop further evidence as the litigation progresses that will enable him to succeed at trial. *Cf. Gillespie & Co. v. Weyerhaeuser Co.* (2d Cir.1976) 533 F.2d 51, 53 (declining to reverse the denial of a preliminary injunction while recognizing that the movant might produce additional evidence at trial).

**SO ORDERED.**